[L. A. No. 17182. In Bank. Mar. 3, 1942.]

BEACH D. LYON, as Administrator, etc., Appellant, v. C. A. GOSS et al., Respondents.

[L. A. No. 17594. In Bank. Mar. 3, 1942.]

BEACH D. LYON, as Administrator, etc., Respondent, v. C. A. GOSS, Appellant.

Russ Avery and Harmel L. Pratt for Appellant in L. A. No. 17182 and for Respondent in L. A. No. 17594.

Bartlett & Kearney, Alfred L. Bartlett and Wm. B. Gilroy for Respondents in L. A. No. 17182 and for Appellant in L. A. No. 17594.

CARTER, J.—This action was brought to secure a declaration of the rights of the parties under a contract and lease, and for other equitable relief. Plaintiff has appealed from an interlocutory decree (L. A. No. 17182), and defendant Goss from a final judgment entered five months later (L. A. No. 17594).

The premises affected by the contract and lease cover the ground floor of the Homer Laughlin Building, located at 315 South Broadway, Los Angeles. For many years prior to this litigation these premises had been occupied by the largest public market in Los Angeles. In it there were approximately seventy stalls occupied by sub-tenants operating meat and vegetable markets, grocery stores, and other concessions, and some seven hundred employees were engaged to serve the twenty to forty thousand customers who shopped there daily.

For years prior to March, 1929, the master lease upon the entire premises had been held by a corporation, the Grand Central Public Market, Inc., and the term of its then lease ran to October 31, 1939. For over twenty years defendant C. A. Goss had been interested in this corporation as organizer, president, or general manager. The corporation ordinarily followed the plan of sub-leasing the various stalls to sub-tenants, who operated individually but were subject to certain rules and to the supervision of the corporation.

On March 11, 1929, Mr. Goss and Homer Laughlin, the owner of the Homer Laughlin Building, entered into an agreement for a lease of the market property for a term of twenty years commencing November 1, 1939, and ending October 31, 1959. It will be noted that at the time of the execution of this contract the outstanding master lease had approximately ten years and eight months to run, and that immediately upon its termination, the new lease was to take effect.

The agreement of March 11, 1929, recited that Mr. Goss was desirous of securing a lease of the premises for the 1939-1959 term, and for it offered to pay Mr. Laughlin, as a bonus and in sole consideration of the execution of the lease and not as any part of the rental, the sum of $1, together with certain portions of the income which Mr. Goss would receive as lessee. The agreement further recited that Mr. Laughlin had accepted the offer, and had that day executed a lease to Mr. Goss for the twenty year term at a fixed rental of $2,280,000, payable at the rate of $9,500 a month on the first day of each month commencing November 1, 1939.

It was provided that the premises would continue to be used for a market without substantial change in the method of operation, and that Mr. Goss would proceed with diligence to procure sub-leases and contracts for sub-leases from responsible persons who wished to conduct merchandising establishments in the stalls and would agree to make bonus and rental payments to at least the minimum amount specified in a schedule attached to the agreement. According to the schedule, the total of all bonuses for subleasing the entire market would be $485,000. Of this sum Mr. Laughlin was to receive the first $205,000, and the balance was to be divided equally with Mr. Goss. The schedule also called for a total minimum rent from subleases of $17,410 a month, of which $9,500 was to be paid to Mr. Laughlin outright and the balance was to be divided equally with Mr. Goss.

The agreement declared that Mr. Laughlin entered into it because of special confidence and trust in Mr. Goss and his long experience in subleasing and managing the premises. Mr. Goss covenanted to endeavor immediately to secure subleases and sublease contracts and to continue the endeavor with diligence until all available space was subleased. He also agreed that he would procure contracts calling for the payment of bonuses in the sum of $75,000 by March 11, 1932, and additional contracts providing for the payment of further bonuses in the sum of $130,000 by March 11, 1935, or a total of $205,000, and that by the latter date he would also have subleases providing for a rental income over the term of not less than $9,500 a month, time being expressly made the essence of the agreement. In the event of his failure to so perform by March 11, 1935, it was provided that the agreement and all of his interest in the master lease and in all subleases and contracts should immediately cease and determine, and that all sums paid in should be held by Mr. Laughlin as liquidated damage for the breach. Provision was made for the deposit of all income with a trustee bank, to be disbursed in accordance with the terms of the agreement, and also for conditional assignment of the master lease to the trustee, to be held for the benefit of the one party or the other, conditioned upon performance or nonperformance of the agreement by Mr. Goss.

On April 23, 1929, the parties addressed a letter to the trustee which among other things provided that all subleases and contracts for subleases should be submitted to Mr.

Laughlin for approval, and that without his approval none would be entered into by Mr. Goss or accepted by the trustee.

On May 28, 1930, the parties addressed another letter to the trustee wherein it was agreed that in case any of the contracts or subleases delivered to Mr. Laughlin as part of the $205,000 first to be delivered to him, should be cancelled by reason of the default of the maker, then such contracts would be replaced or made good to Mr. Laughlin from later contracts. It was also provided that the first available funds, if necessary, even those due Mr. Goss, could be used by the trustee to meet semi-annual installments on a mortgage outstanding against the Homer Laughlin Building, Mr. Goss to be later reimbursed for such advances.

Subsequent to execution of the agreement Mr. Goss proceeded with diligence to perform. Prior to April 20, 1931, he obtained and delivered to the trustee, and secured the approval of Mr. Laughlin on thirty-four contracts to enter into leases and thirty-four subleases with persons desiring to conduct merchandising stalls on the premises. The total amount of the bonuses to be paid under these contracts was $282,000, and the total monthly income provided by the subleases was $7,400.

On April 20, 1931, the parties addressed another letter to the trustee. It called attention to the provision of the agreement that in event of failure by Mr. Goss to obtain the specified contracts and subleases by March 11, 1935, his interest should cease and determine. It then stated: "The second party (C. A. Goss) has at this time secured sufficient subleases and contracts to enter into subleases to assure the performance of the covenants and conditions of said trust agreement on his part to be kept and performed and it has now been agreed that first party (Homer Laughlin) now waives said provision of the trust agreement and from this date said trust agreement shall be held to be a binding contract and it is agreed that no default thereof can be declared by first party (Homer Laughlin) because of any present or future violation or failure to perform the provisions of said trust agreement hereinbefore and in this letter set out." The letter further provided that in consideration of the premises, it was agreed that all bonus and sublease income received by the trustee, over necessary expenses, should be paid to Mr. Laughlin until he should have received $205,000 net, and that in case the Grand Central Public Market, Inc., should

pay $13,500 advance rent, it should be turned over to Mr. Laughlin. This advance rental was subsequently paid.

On December 27, 1932, Mr. Laughlin died, and Beach D. Lyon, plaintiff herein, was appointed administrator with the will annexed of his estate. Meanwhile an economic depression had settled upon the country, twenty-six of the thirty-four contracts for subleases were in default, and at least twenty-three of them had to be cancelled. The trustee received only $65,692.42 in bonuses, including installments on defaulted contracts, of which it paid $43,800.64 to Mr. Laughlin, and after the deduction of expenses retained a balance of $14,258.69. The contracts in default were not replaced. In 1937 Mr. Goss procured from a responsible person an additional contract for a sublease and $8,000 bonus, accompanied by a $1,000 deposit, but the administrator refused to approve the transaction. This refusal, according to findings of the trial court, was unreasonable and unjustified but it was not made in bad faith to prevent, nor did it prevent further performance by Mr. Goss of the agreement of 1929.

As the time approached for commencement of the term of the 1939-1959 master lease, the necessity for procuring subleases for the remaining stalls became pressing. On June 30, 1938, the administrator brought the present action against Mr. Goss and one of his associates. The prayer of the complaint was for a declaration of the rights and duties of the parties under agreement of 1929, and for such other and further relief as should be just and equitable. Defendant Goss alleged in his answer that the agreement was valid, subsisting, and had not been forfeited, and asked that plaintiff be restrained from delaying or hindering performance, and for general relief.

Trial of the cause was completed and findings were entered on March 2, 1939, less than eight months prior to the commencement date of the term of the master lease. In addition to finding facts as already set forth, the trial court defined the rights and duties of the parties and found the further facts to be in substance as follows:

Defendant Goss failed to replace or make good any of the contracts for leases cancelled by reason of the default of the makers, and failed to continue with diligence his endeavor to secure contracts, but this failure was due in part to plaintiff's refusal to accept contracts submitted for approval, and in part to the acquiescence by Mr. Laughlin and by plaintiff

in delays in securing additional contracts, by their construction of the agreement of 1929 and modifications thereof, and by their failure to insist upon strict performance. The waiver clause embodied in the letter of the parties of April 20, 1931, was executed for a valuable consideration passing to Mr. Laughlin. By it defendant ''was relieved of his obligation to secure contracts for leases with bonuses of $205,000, payable on or before October 31, 1939, and monthly rentals of $9,500 and his obligation to replace or make good contracts which were cancelled within the periods stipulated in the contract, that is to say, bonus contracts in the amount of $75,000 by the 11th day of March, 1932, and contracts in the additional amount of $130,000 on March 11, 1935; but he was not relieved of his obligation to continue diligently in an endeavor to replace or make good contracts that had been cancelled, nor was he relieved of his obligation to replace and make good said contracts within a reasonable time.''

In determining what would be a reasonable time, the court stated that consideration should be given to the conduct of the parties, the acquiescence of Mr. Laughlin and plaintiff in the delay in replacement, and plaintiff's refusal to accept the contract submitted for approval or to cooperate with defendant. In view of these circumstances, the court found, a reasonable time had not elapsed within which the contracts must be replaced or made good and ''that a reasonable time therefor would be four months after the filing of an interlocutory decree'' in stated terms.

It was the intention and agreement of the parties, the court further found, that defendant should continue his efforts until all space in the market was rented, but it was not their understanding that if he failed to rent all space before November 1, 1939, his rights and interests under the agreement of 1929 should terminate. In view of the conduct of the parties it would be inequitable to terminate his rights immediately, without affording him an opportunity to fulfill his obligations, but as it was doubtful that he would be able to obtain the requisite contracts and leases, it would likewise be inequitable to allow him more than four months after the filing of the interlocutory decree within which to obtain contracts with bonuses of not less than $205,000, payable on or before October 31, 1939, for leases calling for monthly rentals of at least $9,500. In view of the time which had elapsed during which no acceptable contracts were se-

cured, and in order to show the responsibility of the prospective subleases, each contract for a sublease should be accompanied by a deposit of not less than 10 per cent of the total bonus to be paid, with an additional 10 per cent payable within sixty days after acceptance of the contract and sublease by plaintiff, and the balance of the bonus, without interest, should be payable on or before October 31, 1939. If within four months after entry of the interlocutory decree, defendant should obtain contracts and subleases from responsible tenants upon the specified terms, this would constitute a substantial performance by defendant up to that time of the agreement of 1929, and he would thereafter have the right, so long as he used diligent efforts, to continue to secure contracts and leases for all unrented stalls. The court intentionally and expressly failed to adjudicate or define the rights of the parties, or what would constitute a substantial performance of the agreement of 1929, or under what circumstances it might be inequitable to compel further performance, in the event of a substantial failure on the part of defendant to rent all of the stalls upon the specified terms.

On the same day that the findings were filed, March 2, 1939, an "Interlocutory Judgment and Decree" was entered. It adjudged that the agreement of 1929 was still in force and that defendant was entitled to an opportunity to fulfill it; that he should be allowed four months thereafter within which to procure and submit contracts and subleases upon the terms set forth in the findings, and that plaintiff should, without delay, approve all such contracts and subleases offered by responsible tenants; that in the event of performance to the required extent within the four months' period, defendant should be given the right to proceed with diligence to rent the remaining stalls; that in the event of non-performance to the required extent within four months, or failure thereafter to continue diligent efforts to rent remaining stalls, the right of defendant should immediately cease and determine. Lastly, provision was made for a further hearing at the end of the four months and it was expressly declared that "no adjudication is made as to what the rights of the parties would be in the event defendant Goss should be unable to secure contracts and subleases for all of the stalls in the market or the bonuses and rentals set out in the schedule."

Plaintiff appealed from this interlocutory decree on the

theory that it constituted a final judgment and was therefore appealable (L. A. No. 17182). Defendant did not appeal.

On April 14, 1939, well within the four months period, defendant filed a petition for an order directing plaintiff to show cause why he should not be ordered to approve contracts for subleases which had been submitted to him, and why the four months period should not be extended. The order to show cause was issued and hearings were had on it on April 21st and 28th. The court found that in an effort to comply with the terms of the interlocutory decree, and in an endeavor to secure subleases with responsible persons, defendant had acted and was continuing to act with diligence; that he had employed experienced assistants, advertised in newspapers, and written to and made personal contact with many present and prospective tenants. Subleases had been secured from seven different parties, but plaintiff had rejected six and failed to act on the remaining one. All of prospective tenants save one were responsible parties, and plaintiff was not justified, with the one exception, in failing to approve the proffered contracts and subleases. The court also found that plaintiff, being familiar with the provisions of the interlocutory decree, had wilfully failed to comply with it by neglecting and refusing to approve subleases, that he had also failed to cooperate with defendant in his endeavor to secure contracts, and that these facts had become a matter of general information to present and prospective tenants of the market. With respect to the charge that such wilful misconduct on the part of plaintiff had materially affected defendant's progress in performing and that it justified an extension of the four months period, the court expressly reserved its finding until the final hearing provided by the interlocutory decree.

In July, 1939, after expiration of the four months, plaintiff made a motion, supported by affidavits, for further hearing and for entry of a final judgment decreeing that because of defendant's failure to perform, all of his rights under the agreement of 1929 had ceased and determined. Defendant offered counter-affidavits to prove that his failure was due to plaintiff's interference and prevention of performance. The matter came on for hearing on August 8, 1939, and after some discussion the court stated: "You had better offer your proof. I think this hearing now may be considered to be a resumption of the trial of the case as part of the trial." Oral evidence was thereupon introduced by both sides, by plaintiff to prove

nonperformance by defendant, and by defendant to prove prevention of performance by plaintiff. The court, however, declined to try the issue of prevention and performance and, on motion of plaintiff, it struck out all testimony on behalf of defendant on that subject. Findings were then filed.

The court found that contracts and subleases in good standing procured before and after entry of the interlocutory decree provided for bonuses in no more than the sum of $106,400 and for monthly rentals of no more than $3,545; that defendant had submitted further contracts and subleases, but plaintiff had refused to approve them and would not approve any further contracts; that defendant had offered to prove that plaintiff's refusal had interfered with his efforts to perform but that the court had refused to try that question for the reason that "it was not in issue and its determination was not essential to a declaration of the respective rights of the parties. . . ."

From these findings the court concluded as a matter of law that neither plaintiff nor defendant had complied with the terms of the interlocutory decree, that the only issues properly triable were those essential to a declaration of the rights of the parties, and that the interlocutory decree constituted a complete declaration of those rights. A final decree was thereupon entered adjudging "that neither party have or recover of the other any relief other than a declaration of their respective rights as set forth in the interlocutory decree heretofore made and entered and the findings of fact and conclusions of law this day made and filed, after trial had pursuant to the terms of the interlocutory decree."

Defendant appealed from this final decree (L. A. No. 17594). Plaintiff did not appeal but reasserted his position that the interlocutory decree constituted a final judgment and that the points made by him on his appeal from that decree were well taken.

[1] The first question to be considered is that of the nature of the interlocutory decree. A decree in equity which is denominated "interlocutory" and directs a further hearing for certain purposes, may make so complete and final an adjudication of all issues of fact and law as to constitute a "final judgment" within the meaning of that term as used in the statutes concerning appeals. The problem of determining whether a particular decree is essentially interlocutory and

nonappealable, or whether it is final and appealable is often a difficult one. Two conflicting lines of authority bearing upon the subject are reviewed in *Security-First Nat. Bank* v. *Superior Court*, 132 Cal. App. 683 [23 Pac. (2d) 1055]. (See also *Perry* v. *West Coast Bond & Mortg. Co.*, 136 Cal. App. 557 [29 Pac. (2d) 279]; *Los Angeles A. T. Co.* v. *Superior Court*, 94 Cal. App. 433 [271 Pac. 363]; *Johnson* v. *Solomons*, 124 Cal. App. 43 [12 Pac. (2d) 140]; *Hollar* v. *Saline Products, Inc.*, 3 Cal. (2d) 80 [43 Pac. (2d) 273]; *Heywood* v. *Sooy*, 4 Cal. (2d) 352, 353 [49 Pac. (2d) 826]; *Middleton* v. *Finney*, 214 Cal. 523 [6 Pac. (2d) 938, 78 A. L. R. 1104]; *Doudell* v. *Shoo*, 159 Cal. 448 [114 Pac. 579]; *Krotzer* v. *Clark*, 178 Cal. 736 [174 Pac. 657]; *Maxwell* v. *Superior Court*, 1 Cal. (2d) 294 [34 Pac. (2d) 475]; *Clement* v. *Duncan*, 191 Cal. 209 [215 Pac. 1025]; 2 Cal. Jur., secs. 18, 23, pp. 137-150.)  It is not the form of the decree but the substance and effect of the adjudication which is determinative.  As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory.

The present action was brought under the declaratory relief statute (Code Civ. Proc., sec. 1060), which specifically provides that a party "may ask for a declaration of rights or duties . . . and the court may make a binding declaration of such rights or duties, whether or not further relief is or could be claimed at the time," and the declaration "shall have the force of a final judgment." Under this statute the court could have terminated the action at the time of entry of the interlocutory decree by confining its provisions to a declaration and adjudication of the rights and duties of the parties without reservation for future consideration of matters requiring further judicial action. The interlocutory decree would then have had the force of a final appealable judgment.

The court, however, undertook to administer further equitable relief in accordance with the general prayer of the pleadings.  This was not improper, for equity, having once obtained jurisdiction of a cause, will dispose of the entire controversy (10 Cal. Jur., sec. 40, p. 496), but it did have the effect of

establishing the character of the first decree as purely interlocutory and nonappealable. In other words, that decree reserved for future consideration not only the matter of compliance or noncompliance with its terms, but also issues pertaining to performance and prevention of performance of the agreement of 1929; in fact, it did not even complete the declaration of the rights and duties of the parties but expressly stated that no adjudication was made as to what their rights would be in the event defendant was unable to secure contracts and subleases at the figures specified in the schedule. That the decree thus lacked finality and called for further judicial action on the part of the court is obvious.

It is true that when the time came for a final hearing and the entry of a final decree, the court refused to entertain the evidence adduced on the issue of prevention of performance, and attempted to restrict its adjudication to a mere affirmance of the declaration of rights and duties as set forth in the interlocutory decree, to the same effect as if that decree had in fact been final. That is, the court refused on the final hearing to make the further adjudication contemplated by the provisions of the interlocutory decree, or to administer general equitable relief designed to dispose of the entire controversy, but instead concluded as a matter of law that the only issues properly triable were those essential to a declaration of the rights of the parties, that the interlocutory decree constituted a complete declaration of those rights, and that neither party should have or recover any other relief. However, this attempted restriction and wrongful procedure could not operate retroactively to alter the purport of the interlocutory decree and accord to it a finality which it did not possess.

Although the attempted appeal of plaintiff from the interlocutory decree (L. A. No. 17182) was ineffectual and must be dismissed, a consideration of the propriety of that decree is necessary to a proper disposition of defendant's appeal from the final judgment (L. A. No. 17594). Therefore, the entire record will be reviewed on the merits and the contentions made by plaintiff in his briefs on appeal L. A. No. 17182 will be considered briefly both in answer to defendant's points on appeal L. A. No. 17594, and for the guidance of the trial court on further hearing of the cause.

█ A primary question is that of the validity of the agreement of 1929. Plaintiff contends that it is void for want of mu-

tuality in that it did not bind defendant to any obligation or to the performance of any act; the only promise on his part was to endeavor to secure contracts and subleases, and in event of his failure, no legal liability was imposed upon him; he was free to abandon the enterprise at any time.

The consideration recited in the agreement is payment of $1 by defendant to Mr. Laughlin, together with proportions of the income to be received by defendant from his use and possession of the premises under the master lease, and execution by Mr. Laughlin to defendant of the master lease. It is also provided that defendant will procure contracts and subleases with responsible persons at scheduled bonus and rental prices, that he will carry liability and other insurance, and that he will immediately place funds and sublease transactions in the trustee bank for handling in accordance with further terms of the contract. The forfeiture clause provides for termination of the agreement upon defendant's failure to perform in the manner specified.

These provisions appear to impose mutual and reciprocal obligations constituting a valid and binding agreement. But even assuming that the point is an arguable one and that the contract was unilateral in its inception, that is, an offer of Mr. Laughlin to lease the premises to defendant if defendant performed certain undertakings in connection with subleasing, it is clear that the agreement became mutual, valid, and binding upon partial performance by defendant prior to April 20, 1931, and the execution on that date for a valuable consideration of the waiver agreement hereinbefore quoted. (Rest., Contracts, vol. 1, p. 33, sec. 45; *Los Angeles Traction Co.* v. *Wilshire,* 135 Cal. 654 [67 Pac. 1086]; *Blumenthal* v. *Goodall,* 89 Cal. 251 [26 Pac. 906]; *Noble* v. *Reid-Avery Co.,* 89 Cal. App. 75 [264 Pac. 341]; *Bank of America* v. *Lane Mortg. Co.,* 18 Cal. App. (2d) 431 [63 Pac. (2d) 1189]; *Caspary* v. *Moore,* 21 Cal. App. (2d) 694 [70 Pac. (2d) 224]; 6 Cal. Jur. 211-215, secs. 139-141.)

A further contention is that defendant abandoned or breached the contract subsequent to the death of Mr. Laughlin in 1932. In this connection the trial court properly construed the waiver agreement as relieving defendant of his obligation to secure, prior to March 11, 1935, contracts for $205,000 in bonuses, and subleases providing a monthly rental of $9,500, but as not relieving defendant of his obligation to continue diligently in an endeavor to replace or make good

the cancelled contracts within a reasonable time. ■ The question of what constituted a reasonable time was of course one of fact. In determining it the court properly took into consideration the conduct of the parties, the acquiescence of Mr. Laughlin and plaintiff in defendant's delay in replacement, the construction which the parties themselves placed upon the contract, that is, that it did not require defendant to replace or make good the contracts prior to October 31, 1939, the date of commencement of the term of the master lease, and also to plaintiff's failure to approve the contract and lease submitted to him by defendant and his failure to cooperate with defendant in the securing of contracts and leases. Weighing these factors, the court concluded that on the date of entry of the findings and interlocutory decree, a reasonable time within which defendant might perform had not yet elapsed.

Although the evidence adduced on a retrial might compel a different conclusion, the present record affords sufficient support for these findings. This is so even if it be conceded that the limited authority of plaintiff, as administrator, would not have empowered him to take any action after the death of Mr. Laughlin to revitalize, vary, or waive the performance of the contract provisions. Eliminating this factor, there still remained as a basis for the findings, the effect of the waiver agreement, of Mr. Laughlin's acquiescence in delay in the face of the continuing economic depression, and of defendant's efforts to complete performance despite plaintiff's refusal to cooperate.

■ The further finding that a reasonable time within which to perform would be four months after filing of the interlocutory decree, and that it would be a substantial performance if defendant within that period should secure from responsible tenants contracts for bonuses to the amount of $205,000, and subleases providing a monthly rental of $9,500, each contract to be accompanied by a 10 per cent bonus deposit, with another 10 per cent payable in 60 days, and the balance before October 31, 1939, and if defendant would thereafter continue with diligence to endeavor to rent all remaining space, is subject to the criticism that the court thereby made a new contract for the parties instead of construing the existing contract.

The action being one for declaratory relief, the court could have concluded its adjudication with its declaration of the

rights of the parties and its finding that the contract was still in full force and effect and that a reasonable time for performance had not elapsed. The decree would then have had the force of a final judgment (Code Civ. Proc., sec. 1060, *supra*).

Or if the court felt that a further exercise of its equitable jurisdiction was necessary, it could have provided by interlocutory decree for a further hearing to be held prior to the date of commencement of the term of the master lease, but without the above criticized restrictive provisions relative to performance. On further hearing it could then have appropriately determined whether the contract was still in force, whether under intervening circumstances a reasonable time for performance had elapsed, whether defendant had performed, or whether his performance had been hindered or prevented by plaintiff. Any additional declaration required to completely define the rights and duties of the parties, and any additional adjudication designed to dispose of the entire controversy could likewise have been made.

It was not proper, however, for the court to incorporate new obligations in the contract, or to couch the interlocutory decree in terms of a decree of specific performance by giving defendant a specified time in which to perform and expressly ordering plaintiff to "without delay approve all contracts for subleases and subleases offered by responsible tenants" and to "promptly notify defendant Goss and the tenants of such acceptance."

That the obligations are not such as can be specifically enforced by an affirmative decree is clear. Aside from other reasons suggested, such as lack of mutuality of remedy (Civ. Code, sec. 3386), inadequacy of consideration (Rest., Contracts, sec. 367), etc., it is obvious that the agreement is one for the rendition of personal services which neither party can be compelled to perform (Civ. Code, sec. 3390; Rest., Contracts, sec. 379).

It obligates defendant to perform unique personal sales services, as witness the recital, "This contract is entered into by first party (Laughlin) because of his special confidence and trust in second party (Goss) and second party's long experience in subleasing and managing the premises under leases now in existence and because of second party's peculiar relation and acquaintance with those persons who now conduct mercantile establishments in the   leased premises and

who are prospective sub-tenants under the terms of this contract.'' It obligates plaintiff to accept or reject contracts and subleases submitted for approval, basing his action on his opinion as to the responsibility of the prospective tenants. Although, by virtue of a special provision of the contract, this service is one which plaintiff, as administrator, was empowered to perform after the death of Mr. Laughlin (11b Cal. Jur. 194, sec. 796), it requires an exercise of personal judgment and a degree of cooperation in making the enterprise successful, which cannot be compelled by court decree.

The fact that the contract, although valid, is not susceptible of being made the subject of a decree of specific performance in equity does not leave the parties without remedy or deprive the trial court of its power to proceed with a disposition of the entire controversy. If the court concludes, on retrial, as it did from the evidence offered on the further hearing herein, that a reasonable time for performance of the contract by defendant has elapsed, or that plaintiff has consistently refused and will continue to refuse to approve any new contracts or subleases, and that the agreement has terminated, then it may allow the parties, if they so desire, to amend their pleadings and to litigate their respective legal claims for damages, an issue which will be determined by evidence of whether defendant breached the agreement and failed to perform because of his inability to meet its terms, or whether such failure was due to plaintiff's interference, and refusal to cooperate, or to approve contracts and subleases.

A similar situation was presented in *Long Beach Drug Co. v. United Drug Co.*, 13 Cal. (2d) 158, 172 [88 Pac. (2d) 698, 89 Pac. (2d) 386], where a contract was declared to be valid but not susceptible of specific enforcement by affirmative decree, and for this reason it was there held that ''the court would be constrained to deny equitable relief and to leave the parties to assert their legal rights under the contract.'' The opinion states: ''Although the equitable remedy is not available to plaintiff, nevertheless the contract sued upon is valid and sufficiently certain to warrant the trial court in entertaining a plea for the recovery of damages [referring to cited cases]. The complaint, while praying for 'all just and proper relief', was not framed in the alternative to seek the legal remedy for breach of the contract as a whole . . . Under present code procedure, which permits a

party to litigate his right to legal and equitable relief in the same action, and by amendment to ask a change of remedy, there appears to be no reason why plaintiff, if so advised, should not apply for permission to amend its pleading. (*Farnsworth* v. *Hunter*, 11 Cal. (2d) 27 [77 Pac. (2d) 840]; *Peters* v. *Binnard*, 219 Cal. 141 [25 Pac. (2d) 834]; *Pascoe* v. *Morrison*, 219 Cal. 54 [25 Pac. (2d) 9]; *Ahlers* v. *Smiley*, 163 Cal. 200 [124 Pac. 827]; 10 Cal. Jur., p. 10, sec. 7; note, 22 Cal. L. Rev., p. 208.) Whether the plaintiff is entitled to damages, or to what extent, is not here intimated. That is a matter to be proved upon trial of the issue.''

The appeal from the interlocutory decree is dismissed. The final judgment is reversed.

Shenk, J., Curtis, J., and Houser, J., concurred.