[Civ. No. 28545. Second Dist., Div. Four. Aug. 15, 1966.]

REDD FOXX, Plaintiff, Cross-defendant and Appellant, v. WALTER D. WILLIAMS, JR., et al., Defendants and Respondents; DOOTONE RECORD MANUFACTURING, INC., Defendant, Cross-complainant and Respondent.

Burton Marks for Plaintiff, Cross-defendant and Appellant.

Schoichet & Rifkind and Nathan L. Schoichet for Defendant, Cross-complainant and Respondent and for Defendants and Respondents.

FILES, P. J.—Plaintiff Redd Foxx, an entertainer in nightclubs and on phonograph records, brought this action against Walter D. Williams, Jr., Dootone Record Manufacturing, Inc., and others, for a declaration of rights, accounting, and other relief under a written contract called "ARTIST RECORDING ROYALTY AGREEMENT." Dootone cross-complained against Foxx to recover moneys paid by mistake, for damages, and for an injunction to prohibit breaches of the contract. After a court trial, judgment was entered declaring the rights of the parties, awarding a money judgment in favor of cross-complainant for overpayments, and enjoining Foxx. We have here Foxx' appeal from the judgment.

In the latter part of 1955, while Foxx was performing at the Club Oasis in Los Angeles, defendant Williams suggested that he be allowed to record Foxx' comedy routine there and find

out if phonograph records made therefrom would be salable. Foxx had been a performer for many years but had never made a successful phonograph record. His one previous attempt had sold about 40 copies. Williams was established in the record manufacturing and distributing business, being the president and sole stockholder of defendant Dootone Record Manufacturing, Inc.

The market tests were encouraging, and on January 6, 1956, Foxx and Dootone entered into a written agreement, which will be referred to as the first contract. It stated ''we [Dootone] hereby employ you [Foxx] for the purpose of making phonograph records,'' and provided for a royalty to Foxx of 2 percent of the distributor price. As a minimum, four sides were to be recorded, and additional recordings were to be made at Dootone's election. The term of the contract was one year from the date of execution, with the option in Dootone to renew for an additional two years.

The option in the first contract was not exercised. On January 28, 1957, the parties executed another writing similar in form to the first, but calling for a royalty of 3 percent of the distributor price. This contract also expired at the end of one year, the option not having been exercised.

On April 4, 1958, the parties entered into the third contract, this time for a term of five years, with the option to extend for two years more. This contract provided that ''a minimum of 12 78 RPM record sides, or the equivalent thereof shall be recorded, and additional recordings shall be made at our [Dootone's] election.'' The royalty was 3 percent of the list price (as distinguished from 3 percent of the distributor price provided for in the second contract). The distributor price is approximately one-half of the list price.

To place in context the problems of interpretation which are involved here, the authorship of those writings should be mentioned. The first and second contracts were on a mimeographed form, with the royalty rate and minimum number of record sides typed in. Williams testified that he obtained this form from another manufacturer and changed only the name of the company. Williams further testified:

''Q. Now, with respect to Contract 3, who made that one?

''A. I did, after research and inquiry in the industry.

''Q. Did you consult an attorney?

''A. No.

''Q. Used somebody else's form again?

''A. No, I consulted a number of contracts that were in use at the time and consolidated the items that I thought—

"Q. Took what you thought would be the best from each one?

"A. Yes, that is right."

Between April 4, 1958, and April 6, 1961, Foxx recorded for Dootone under the third contract 16 longplaying records, 26 extended play records and 5 single records. This was many times over the minimum specified in the agreement. It has been stipulated that Dootone has given the notice required to extend the stated term of this contract for its sixth and seventh years.

Commencing in 1956, Dootone submitted to Foxx semi-annual statements purporting to show the number of copies sold of each record and the royalty due. Each statement was accompanied by a check for the balance due as shown by the statement. Foxx made no effort to verify the accuracy of any of these statements except that on one occasion in 1957 an accountant employed by him for tax purposes examined some of Dootone's books.

In early 1961, on a trip east, Foxx talked to some distributors who told him how well his records were selling and who, as he testified, "just sort of aroused my curiosity as to whether I was getting a fair shake and that's how I got started in the thing." Foxx consulted an attorney, and this action was filed April 6, 1961.

At the trial, which was conducted in September 1963, Foxx conceded that Dootone had correctly reported the number of records sold. Foxx' principal contentions then were (1) that after April 4, 1958, all royalties, including those on records made under the 1956 and 1957 contracts, should be computed at 3 percent of the list price, which was approximately double the distributor price, and (2) that the charges which Dootone had made against the royalties for studio costs were improper. The trial court held against plaintiff on both of these points.

With respect to the cross-complaint the trial court found that there had been a mistake in computing royalties, and that Dootone was entitled to recover the amount of its overpayments for the period of two years immediately preceding the filing of the cross-complaint. It also found that Foxx had entered into an agreement with another manufacturer to make recordings as soon as he was legally free to do so, and concluded that, unless restrained, Foxx would make records for a manufacturer other than Dootone. The findings of fact also contain this statement:

"That Cross Complainant has suffered damage and injury

by reason of Cross Defendant's refusal to make or produce recordings since April 6, 1961, but that such damages are exceedingly difficult to compute and that it would be more equitable and to the best interests of both parties to extend the term of the contract of April 4, 1958, by a term equal to that period during which Cross Defendant has refused to perform rather than to impose damages for such failure. That the total period during which Cross Defendant has refused to perform is two years, five months and ten days. That the contract of April 4, 1958, provided, *inter alia,* that should Plaintiff REDD Foxx fail to make recordings at times designated by Defendant DOOTONE RECORD MANUFACTURING, INC. the then current recording year might be extended for such period of time as shall elapse until the Plaintiff REDD Foxx renders the required services.''

The judgment, which was entered October 9, 1963, includes an injunction in the following language:

''IT IS FURTHER CONSIDERED, ORDERED AND ADJUDGED that Plaintiff and Cross Defendant REDD Foxx be, and he is hereby restrained and enjoined during the term of the contract of April 4, 1958, as extended to and including September 14, 1967, from making sound recordings for any other person, firm or corporation, or from making, distributing, selling or authorizing any other person, firm or corporation, to make, distribute or sell any phonograph records, or from recording for himself or any other person, firm or corporation any sound recordings or from using his name, likeness or any other identification in connection with any sound recordings except those made and produced by Defendant DOOTONE RECORD MANUFACTURING, INC. That such injunction shall remain in full force and effect only so long as royalties earned by Plaintiff under the contract of April 4, 1958, equal or exceed the sum of $3,000 for any royalty period beginning with the royalties due on December 31, 1963, and that if on that date or thereafter royalties fall below the sum of $3,000 for any six-month royalty period as that term is defined in said contract then such injunction shall be dissolved and shall be of no further force or effect but the dissolution of said injunction, in the event it occurs, shall be without prejudice to any other remedies available to Defendant DOOTONE RECORD MANUFACTURING, INC. as provided by operation of law or under the terms of the contract of April 4, 1958.''

After Foxx had perfected his appeal in this court he filed a petition for writ of supersedeas on August 13, 1965, to stay the enforcement of that injunction. On August 20, 1965, this

court made its order staying the enforcement of the injunction until further order of this court.

### The Royalty Rate on the First Two Contracts

The first point argued by Foxx on this appeal is that, after the third contract had been executed on April 4, 1958, Dootone was thereafter obligated to pay a royalty of 3 percent of the list price on all records, including those which had been made under the 1956 and 1957 contracts. The language of the three agreements on this subject is unambiguous, and Foxx' theory is clearly incorrect. The first two contracts call for a royalty computed upon the distributor price. The third contract provides for ''a royalty of 3% of the list price in the country of manufacture, of 90% of all records sold embodying performances hereunder on both sides thereof, . . .'' It is conceded that the period for Foxx' performance under the first two contracts had expired before the third was executed. There are no circumstances shown which would justify interpreting the third contract as changing the royalty terms for records theretofore made under the first two agreements.

Foxx' brief refers to the testimony which he gave, without objection, that around April 4, 1958, he had a discussion in which Williams told him that he would get ''three percent of everything,'' including records made before that time. According to Foxx, Williams did not say 3 percent of what. It was ''Just three percent.'' Williams was asked if he remembered such a conversation and he answered ''No.''

Even assuming that Foxx' testimony should be accepted as undenied, it shows no more than that a party made an oral promise which was at variance with the written agreement. Under the circumstances such a statement has no legal effect. The 1958 contract appears to have been adopted as the final and complete expression of the agreement of the parties—an ''integration,'' as that term is used in the Restatement of Contracts section 228.

''The parol evidence rule, as is now universally recognized, is not a rule of evidence but is one of substantive law. It does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), *becomes the contract of the parties.* The point then is, not how the agreement is to be proved, because as a matter of law the writing is

the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations. (See Civ. Code, § 1625; Code Civ. Proc., § 1856; . . ." (*Estate of Gaines*, 15 Cal.2d 255, 264-265 [100 P.2d 1055].)

The 1958 contract is in some respects ambiguous and uncertain, but this much is clearly established by the writing: that the royalty specified therein applies to records "embodying performances hereunder," and not to recordings made under the earlier contracts.

Foxx complains of a number of rulings made by the trial court sustaining objections during his testimony. So far as can be determined from the transcript, what was excluded was Foxx' attempt to testify to oral statements of Williams which were in conflict with the royalty clause of the 1958 contract. Such statements were properly excluded under the rule referred to above. The trial court advised counsel that evidence would be received for the purpose of interpretation, but counsel failed to show the trial court and has not suggested here any way in which the excluded answers would assist the court in interpreting the writing, as distinguished from proving a conflicting oral promise.

### The Overpayments

Williams testified that all of the royalty statements until 1961 had been made up by a bookkeeper who had computed the royalties under the 1956 and 1957 contracts on the basis of retail list rather than distributor's price; that he, Williams, did not discover this until he made an investigation sometime after this action had been filed; and that he would not have approved the payments if he had known. The trial court accepted this testimony as true, and its finding on this factual issue is conclusive here. (*People* v. *Hills*, 30 Cal.2d 694, 700 [185 P.2d 11].) The finding of fact supports the judgment for refund of the overpayments.

The law applicable to such overpayments is set forth in *American Oil Service* v. *Hope Oil Co.*, 194 Cal.App.2d 581, 587 [15 Cal.Rptr. 209] : "Whether the payments were made voluntarily or through mistake depended upon the intentions of plaintiff in making them. These were to be judged in light

of the facts that were known to plaintiff. Means of knowledge were not the equivalent of knowledge. We would suppose that most mistakes of fact occur through failure to resort to means of knowledge.''

This rule of law was restated and applied in the second appeal of that case. (*American Oil Service* v. *Hope Oil Co.,* 233 Cal.App.2d 822, 830 [44 Cal.Rptr. 60].)

### Studio Costs

██ The only studio costs which Foxx contended were unnecessary were the expenditures for food and liquor served to the studio audiences. The reasonableness of these charges is established by the testimony of Williams, and the trial court's finding on this factual matter is not reviewable on appeal.
██ There remains the question of law whether any studio costs were deductible from the royalties under the contracts.

Williams conceded in his testimony that he charged against Foxx' royalties ''studio costs,'' which he said, include ''all costs pertaining to making the sound production.'' When a recording was made in a studio (as distinguished from a nightclub where a paying audience was present) the practice was to invite a group of persons to attend and provide background laughter for Foxx' performance. Williams purchased food and drink for these guests to put them in the proper mood for their participation. This expense was included in the ''studio costs'' charged against the artist's royalties. The royalty statements contained no itemization of ''studio costs.'' All charges which Dootone claimed against royalties were lumped in a single item called ''advances and charges'' at the bottom of each royalty statement.

██ The 1956 and 1957 contracts said nothing about charging the artist for studio expense. Those agreements simply declare that ''we hereby employ you for the purpose of making phonograph records'' and ''We will pay you in respect of recordings made hereunder, a royalty'' at the specified rate. Foxx should not have been charged any studio costs for recordings made under those two contracts.

██ The third agreement is altogether different in form. It includes the following language:

''1. The Artist(s) hereby sells, assigns, transfers and delivers to the Company, its successors and assigns, certain creative sound productions, recordings or masters for the purpose of making phonograph records.

''.  .  .  .  .  .  .  .  .  .  .  .  .  .

"4. For the services of the musicians hereunder, and for your services as a vocalist, we will make a non-returnable payment within fourteen days after the services are rendered, at the rate of union scale of musicians and per side to you as vocalist. Such payments shall be charged against your royalties when earned. We will render an accounting to you within forty-five (45) days after June 30th and after December 31st of each year during which records made hereunder are sold.

". . . . . . . . . . . . .

"9. Company will advance compensation and/or other costs of recording (including without limitation thereto, so-called 'studio costs' and where applicable, costs of acquiring the rights to reproduce from sound-tracks or other devices on which Artist's vocal performances are embodied and the rights to sell phonograph records made therefrom), for arrangements, copying, orchestrations, any amounts payable to the sound or recording technicians and personnel, conductor, musicians, and/or other accompanying artists, e.g., choral accompanists, together with all amounts Company is required to pay by reason of any regulation of or agreement with any agency, union or guild, in connection with the recording of the performances for each recording session. Artist agrees to supply such instrumentations, orchestrations and arrangements as Artist may have for the selections to be recorded without any additional payment to Artist, but if the Company's use thereof occasions any additional obligation to the arranger or orchestrator or other person, Company pay same and charge same as an advance against Artist's royalties."

The words of sale contained in paragraph 1 indicate an intention to treat the artist, for accounting purposes at least, as the producer of the sound recording who then sells the master record to Dootone.

Paragraphs 4 and 9 obligate Dootone to advance the necessary studio costs and other production expenses, to be recouped out of royalties. The first sentence of paragraph 9, which covers studio costs generally, does not specifically call for repayment, but the word "advance," in its context, supplies that meaning. Reading paragraphs 4 and 9 together with the language of paragraph 1 which obligates the artist to sell "sound productions, recordings or masters," we can only conclude that the intention was to charge the cost of production against the artist, and to collect it as an offset against royalties. Thus the studio costs incurred in recording after April 4, 1958, were proper charges.

Foxx offered no evidence as to what studio charges, if any, were made against him under the 1956 and 1957 contracts. Only three royalty statements were offered in evidence, only one of which was for a period prior to 1958. Each statement shows a lump sum identified only as "advances and charges" which is deducted from royalties earned. These sums are not explained or itemized. There was testimony that from time to time Dootone advanced cash to Foxx for his personal use, and thus there is no basis for inferring that any part of the amounts called "advances and charges" was for recording expenses.

During the trial Williams produced in court a number of checks which had been written by Dootone for costs of recording sessions which had been charged to Foxx. The checks were not offered in evidence. The attorney for Foxx stated that the total was $2,179.32 and that "Those cover the period from '58 to '61." Since the contract of April 4, 1958, authorizes the deduction of studio costs, and since there is no showing that any amount was deducted for recordings made prior to that date, Foxx is not entitled to any recovery.

### The Injunction

Civil Code section 3423 provides in part:

"An injunction can not be granted:

" . . . . . . . . . .

"Fifth—To prevent the breach of a contract, other than a contract in writing for the rendition or furnishing of personal services from one to another where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum and where the promised service is of a special, unique, unusual, extraordinary or intellectual character, which gives it peculiar value the loss of which can not be reasonably or adequately compensated in damages in an action at law, the performance of which would not be specifically enforced; . . ."

Similar language appears in Code of Civil Procedure section 526.

It is a familiar rule that a contract to render personal services cannot be specifically enforced. (Civ. Code, § 3390; *Lyon* v. *Goss*, 19 Cal.2d 659, 674 [123 P.2d 11]; *Poultry Producers etc. Inc.* v. *Barlow*, 189 Cal. 278, 288 [208 P. 93]; see 5A Corbin on Contracts, § 1204, p. 398.) It follows that the breach of such a contract may not be enjoined except in cases falling within the exception provided for in the quoted statute. The 1958 contract recites that the artist's

performances "are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value," and at pretrial the parties agreed that such characterization was correct. There remains the question whether this is a contract "where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum."

At the trial the parties stipulated to the amounts which Foxx had received as royalties each year from 1956 through 1962, but these figures were not broken down to show what portion was paid for recordings made under the 1958 contract. The royalty statement for the six months ending June 30, 1963, which was the accounting period immediately preceding the trial, showed total royalties for the period as $2,682.27, less advances and charges of $156.

We do not place our decision upon the absence of proof of the amount of royalties earned under the 1958 contract. In our opinion this royalty contract does not meet the requirements of the injunction statute even though it should ultimately appear that the royalties earned, over any given period, should exceed the rate of $6,000 per year.

An injunction which forbids an artist to accept new employment may be a harsh and powerful remedy. The monetary limitation in the statute is intended to serve as a counterweight in balancing the equities. The Legislature has concluded that an artist who is not entitled to receive a minimum of $6,000 per year by performing his contract should not be subjected to this kind of economic coercion. Under the statutory scheme, an artist who is enjoined from accepting new employment will at least have the alternative of earning $6,000 or more per year by performing his old contract.

The trial court's solution to the problem was to grant the injunction for only so long as the royalties for each half year equaled $3,000. This means that the artist is enjoined for 7½ months at a time (6 months plus the 45 days thereafter which the contract allows for the preparation of the royalty statement) without any assurance of earning anything. This is not what the statute calls for.

The portion of the judgment which enjoins Foxx must be deleted.

The elimination of the injunction does not require a remand of the case to the trial court for consideration of a new remedy for the breach of contract. Although the trial court made a finding that Dootone had suffered damage, there was

no evidence to support it. Under the circumstances the most that Dootone would be entitled to for Foxx' breach would be nominal damages. A judgment should not be reversed simply to permit such a recovery. (*Chaparkas* v. *Webb,* 178 Cal.App. 2d 257, 262 [2 Cal.Rptr. 879].)

*Extension of the Contract*

Based upon the stipulated fact that Foxx had "failed and refused to make any recordings . . . from and after April 6, 1961," the trial court computed the period of his refusal, to the date the trial ended, as two years, five months and ten days, and added it to the term of the 1958 contract. The judgment declares that the contract of April 4, 1958, is in effect to and including September 14, 1967.

This portion of the judgment is erroneous for two independent reasons, which will be discussed separately.

The first is that there is nothing in the 1958 contract or elsewhere in the evidence which would justify extending the term during which Foxx is required to record for Dootone and abstain from recording for anyone else. Paragraph 12 of the agreement provides that "during the term" the artist will not record for anyone other than Dootone, but this negative covenant contains no language calling for an extension of the term or of the period of exclusivity.

The duty of Foxx to make recordings during the term of the 1958 contract is set forth in the following language:

"These creative sound productions, recordings or masters, are to be made during the term of this contract and a minimum of 12 78 RPM record sides, or the equivalent thereof, shall be recorded, and additional recordings shall be made at our [Dootone's] election."

It is undisputed that recordings exceeding the minimum had been made prior to the commencement of the action, and there is no evidence of any "election" by Dootone to make recordings other than those which were made.

The trial court's remarks indicate it relied upon paragraph 15 of the 1958 contract which reads as follows:

"15. Should Artist, for any reason whatever, be unavailable for the making of recordings at the times designated by the Company as herein provided, or fail to make recordings at such times, the then current 'recording year' hereof may be extended by the Company for such period of time as shall elapse until Artist renders the required services for the Company. The Company shall have at least thirty (30) days' notice before the Company is required to arrange for the

making by Artist of the recordings for which Artist was unavailable or which Artist failed to make as aforesaid.''

Preliminarily it is noted that the words ''the then current 'recording year' '' are not defined in the contract, nor are they used elsewhere, except in paragraph 17, the force majeure clause, which will be discussed later. This incongruity of language is explained by Williams' testimony that he consulted a number of contracts used by others and ''consolidated the items'' that he thought were the best in each. To make paragraph 15 applicable it is necessary to interpret ''the then current 'recording year' '' to mean the term of the contract.

The form of paragraph 15 suggests that it was lifted from a contract in which the artist was obligated to make a determinable number of recordings within a ''recording year,'' but at times designated by the company. The paragraph provides that if the artist fails to make recordings ''at such times,'' the ''recording year'' may be extended ''for such period of time as shall elapse until Artist renders the required services. . . .''

Such extension is not necessarily for a period equal to the time during which the artist was in default. Rather it is for the period which shall elapse until the artist ''renders the required services.'' The distinction is a substantial one.

It is obvious, from the nature of the business, that the parties did not contemplate that Foxx would be engaged continuously in making records for the entire seven-year term of the contract. The evidence shows that each recording session was about three hours in length, and Foxx testified that he needed eight to ten days to prepare his material for each recording session. The parties must have recognized that they had time to produce a great many more recordings than the market could absorb. The actual number which could be made and sold profitably was not a matter that could be determined when the contract was written. Hence the parties left it to Dootone to call for more recordings as its business judgment dictated. Foxx' obligation under the contract was not to render a given number of days, weeks or years of service, but to make as many records during the seven-year period as Dootone elected to finance, produce and market.

The language of paragraph 15 may be contrasted with the force majeure clause, which is paragraph 17. The latter provides that in the event of fire, strikes, et cetera, the company may suspend its obligations and ''A number of days

equal to the total of all such days of suspension shall be added to the then current 'recording year.' "

The extension under paragraph 17, unlike paragraph 15, is for a period measured by the period of nonperformance.

Since an extension under paragraph 15 is only for the period which shall elapse "until Artist renders the required services," it is necessary to inquire what are the required services. Since Foxx had made more than the minimum, he was not obligated to make any more unless Dootone so elected, of which there is no evidence. Foxx' refusal to perform after April 6, 1961, constituted an anticipatory breach of the contract, which justified Dootone's suing him immediately on the contract. (*Gold Min. & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 29 [142 P.2d 22].) But without proof that Dootone had elected to make any more recordings, the extension provided for in paragraph 15 was not applicable at all.

### The Seven-Year Statute

The second reason why the court should not have extended the contract is found in Labor Code section 2855 which reads:

"A contract to render personal service, other than a contract of apprenticeship as provided in Chapter 4 of this division, may not be enforced against the employee beyond seven years from the commencement of service under it. Any contract, otherwise valid, to perform or render service of a special, unique, unusual, extraordinary, or intellectual character, which gives it peculiar value and the loss of which can not be reasonably or adequately compensated in damages in an action at law, may nevertheless be enforced against the person contracting to render such service, for a term not to exceed seven years from the commencement of service under it. If the employee voluntarily continues his service under it beyond that time, the contract may be referred to as affording a presumptive measure of the compensation."

Dootone contends that Foxx was engaged in an independent calling, and points out that section 2855 uses the word "employee," thereby excluding independent contractors from its coverage. In support of the argument that Foxx was not an employee, Dootone relies upon the cases arising under the Workmen's Compensation Act and cases applying the doctrine of *respondeat superior* to impose liability upon a master for the torts of his servant. Counsel also produced, in opposing the issuance of a writ of supersedeas, affidavits showing that, for accounting purposes, Dootone always treated Foxx as an inde-

pendent contractor; that there never was any withholding of income tax, social security tax or state disability assessment which the law requires with respect to employees.

We do not think such considerations are determinative of the applicability of section 2855. The definitions of "employee" and "independent contractor" in the Workmen's Compensation Law (Lab. Code, §§ 3350-3353) are said to be the meanings "used in this division," i.e., division 4 of the Labor Code, not division 3 wherein section 2855 is found. The public policy which underlies the doctrine of *respondeat superior* is altogether distinct from the legislative policy which is expressed in section 2855. (See *De Haviland* v. *Warner Bros., Inc.*, 67 Cal.App.2d 225 [153 P.2d 983], for explanation of the history and purpose of § 2855.)

Section 2855 is a part of Labor Code division 3, which is headed "Employment Relations." This division includes the following definition:

"§ 2750. The contract of employment is a contract by which one, who is called the employer, engages another, who is called the employee, to do something for the benefit of the employer or a third person."

Division 3 also contains, in chapter 3 thereof, headed "Master and Servant," this definition:

"§ 3000. A servant is one who is employed to render personal service to his employer, other than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the employer, who is called his master."

It appears from a reading of these definitions that, at least in division 3 of the Labor Code, the Legislature has given a broader meaning to the word "employer" than to "master," and, inferentially, that "employee" is broader than "servant."

In determining whether or not the contract before the court is "a contract to render personal service," we consider what the artist was required to do in the performance of the agreement. An examination of the contract in the light of the surrounding circumstances leads us to the conclusion that Foxx' performance was rendition of personal service, and that he was an employee, as that term is used in division 3 of the Labor Code.

The first two contracts between Dootone and Foxx were by their express terms contracts to render personal services as an employee. The opening sentence of each was as follows:

"This contract for your personal services as a vocalist

between DOOTONE RECORDS as the employer, and you as the vocalist, and we hereby employ you for the purpose of making phonograph records.''

The manner in which services were performed remained the same throughout the entire period from 1955 to the commencment of the action in 1961. Foxx prepared his own material at home, using his own library of joke books and his own experience as a comedian, making up new jokes and adapting old ones. Williams suggested some material but Foxx says he used very little of it. Recording sessions were held either in a recording studio or at a nightclub where Foxx was performing. Foxx brought with him the material which he had written and which his wife had copied on the typewriter. Foxx then put his script on a music stand in front of a microphone and performed.

Williams testified, without contradiction, that he made all of the arrangements for these recording sessions. This means Dootone selected the place of recording, selected and operated (or arranged for) the recording equipment, determined whether other persons should be present for background, selected and invited all of the other persons who were to participate, and paid the cost of all of this. Foxx' performance was recorded on tape. Williams edited the tape, selecting the best material which would give a recording of the desired length. From this, Dootone produced the records. The following testimony by Foxx (which is uncontradicted) is illuminating:

''Q. Did you ever know before the album was actually produced what was going to be on the album?

''A. I never knew, I just recorded the material. Mr. Williams, he finished the product.

''Q. Did you ever have any discussions with him about that subject?

''A. Yes, we discussed it quite a bit, to no avail, because I would ask him sometimes to edit it. He said he was the producer, you do what you do and I'll take care of my end.''

As indicated above in the discussion of ''studio costs,'' the language of the 1958 contract is susceptible to the interpretation that Foxx was to produce the recordings and sell them to Dootone. But the surrounding circumstances, and particularly the manner in which the parties were performing, both before and after April 4, 1958, indicate that those provisions were for

accounting purposes only, and did not change the employer-employee relationship which had existed since January 1956.

A case relied upon by Dootone provides an excellent contrast with the facts here, and thereby illustrates the point. *Ketcham* v. *Hall Syndicate, Inc.,* 37 Misc.2d 693 [236 N.Y.S.2d 206], affd. 19 App.Div.2d 611 [242 N.Y.S.2d 182], was an action brought by the creator of a cartoon strip for a declaration of rights under a 10-year contract whereby he had agreed to deliver his cartoon panels to the New York office of a news syndicate. Plaintiff there contended that the contract could not be enforced against him after seven years, because of California Labor Code section 2855. The court gave judgment against plaintiff, holding that section 2855 did not apply, both because plaintiff was not an employee, and because the law of New York, not California, governed.

Although the statement of facts in the *Ketcham* case is brief, it seems clear that plaintiff there created an artistic product, reduced to tangible form, and then sold it to defendant, together with the privilege of reproducing it commercially. In the case at bench Foxx served as a writer and a performer. His performance, combined with the managerial, artistic and technical skills of Dootone's employees, resulted in an intangible product, recorded sound, which Dootone used in the production of salable merchandise.

Ketcham, by himself, produced an article which he shipped across the country to the Hall Syndicate. Foxx, by himself, produced nothing. His skill and artistry were essential ingredients, but no recording would have resulted without the application of the capital, management and technical work supplied by Dootone. There is no evidence that Foxx was qualified by training or experience to assume the responsibility for making a recording, or that anyone expected him to do so. Except for Foxx' complaints about not being consulted on editing, and not being allowed to invite his friends to the recording sessions, there is no evidence that anyone ever contemplated that he would do more than come in with a script, as instructed, and render services as a performer.

We are mindful that this contract did not call for full-time employment, and that the greater part of Foxx' time was devoted to his other calling as a nightclub entertainer. Although this fact may to some extent dilute the policy considerations discussed in the *De Haviland* opinion (67 Cal.App.2d at p. 235), the statute makes no distinction between full-time and part-time employment.

Although Foxx' contract did not require his continuous performance, the relationship of the parties, as shown by the evidence, compels the conclusion that this is a "contract to render personal service" which is subject to the seven-year limitation.

### Reuse of Material

Foxx contends on this appeal that the trial court erred in failing to declare unenforceable paragraph 12(f) of the 1958 contract. By this provision Foxx agreed in substance that for five years after the expiration of the contract he would not make any phonograph records embodying any composition which he had recorded under the agreement. Foxx argues that this provision is unreasonable and should be annulled on that ground.

The record on appeal shows that this contention was never made in the trial court. The second amended complaint, upon which the case went to trial, contains no mention of paragraph 12(f) and no request for a declaration of rights on this subject. The joint pretrial statement and the pretrial order are likewise silent. Neither party offered any evidence of circumstances which would assist the court in determining whether this clause is reasonable or unreasonable. It does not appear that the subject was presented to the trial court in any way. Appellant is not entitled to raise the issue for the first time on appeal. (*Everly Enterprises, Inc.* v. *Altman,* 54 Cal.2d 761, 765 [8 Cal.Rptr. 455, 356 P.2d 199].) The application of this rule is especially compelling here since evidence might have been offered to show the purpose and effect of the clause to prove its reasonableness, if the issue had been raised.

### The Accounting

At the time this appeal was argued and submitted Foxx made a "motion for order for accounting by respondent and in the alternative for an order of reference to the superior court." In support of the motion Foxx declared that, on June 30, 1961 (after the commencement of this action), Dootone gave him a statement showing overpayments amounting to $18,236.64 under the 1956 and 1957 contracts, and that for each accounting period thereafter Dootone has made deductions from his royalties based upon this claimed offset. Foxx further declares that, although the trial court awarded Dootone recovery of only $8,128.52 for overpayments under the 1956 and 1957 contracts, Dootone has now withheld an amount in excess of that sum and claims the right to withhold more.

In response, Williams has filed a declaration in which he asserts that Dootone was entitled to offset interest and costs and other items.

The motion itself is an attempt to litigate in this court matters which should properly be raised in the superior court, either on a motion to declare the judgment satisfied, or on remand of this action or in a new action. Hence we deny the motion by an order filed concurrently herewith. But the issue adverted to serves to illustrate a defect in the judgment which must be considered.

In this action, in which the plaintiff and the cross-complainant each has been found to have a valid claim against the other, the judgment fails to state the dollar balance due from one to the other as of any given date. The trial court made findings that Dootone has "properly accounted to Plaintiff for all records sold and properly charged Plaintiff with expenses as permitted under the contracts." The judgment contains declarations construing the contracts and provides that Dootone "is hereby ordered to pay to Plaintiff" royalties computed at the rates specified in the court's findings. The judgment also provides that Dootone "have and recover from Cross Defendant REDD Foxx the sum of $4,708.59 as overpayments made on the contract of January 6, 1956; and the sum of $3,419.93 as overpayments made on the contract of January 28, 1957, from and after July 12, 1959 to December 31, 1960."

Apparently the finding that Dootone had "properly accounted" was intended to mean only that Dootone's reports of sales and expenses were correct, not that Dootone had paid Foxx all of his royalties. Instead of determining and stating in dollars the amount of the royalties earned and unpaid to date, the trial court gave what was in terms a mandatory injunction to Dootone to pay royalties at specified rates. A proper decision in the trial court would have required a computation of the royalties earned and unpaid as of the end of the most recent accounting period, an offset of the overpayments, and the determination of a balance, for which judgment could have been entered in favor of one party or the other.

The reason no such decision was given in this case is that counsel failed to introduce evidence from which the balance could be computed. The error was invited, but we cannot ignore the defect in the judgment, for to do so would only compound the difficulty. The issue will not be at rest until a

court determines what the actual amounts are. Since the action must be remanded to the trial court for this purpose, the account may as well be brought down to date.

The judgment is reversed and the action remanded to the superior court with directions to determine the balance then due as between plaintiff and Dootone, under the three contracts, using, so far as applicable, the findings of fact heretofore made, and to enter a judgment consistent with this opinion.

Jefferson, J., and Kingsley, J., concurred.