[No. S002524. June 25, 1990.]

CALIFORNIA ASSOCIATION OF PSYCHOLOGY PROVIDERS et al., Plaintiffs and Respondents, v.
PETER RANK, as Director, etc., et al., Defendants and Respondents;
CALIFORNIA HOSPITAL ASSOCIATION et al., Movants and Appellants.

**COUNSEL**

Horvitz, Levy & Amerian, Horvitz & Levy, Ellis J. Horvitz, Grant Marylander and David S. Ettinger for Movants and Appellants.

Kirk B. Johnson, Sidley & Austin, Carter G. Phillips, Onek, Klein & Farr, Joel I. Klein, Munger, Tolles & Olson, Allen M. Katz, Davis, Cowell &

Bowe and Richard G. McCracken as Amici Curiae on behalf of Movants and Appellants.

Licht & Bloom, Michelle H. Licht, Richard H. Bloom, Hogan & Hartsten, Clifford D. Stromberg and Barbara F. Mishkin for Plaintiffs and Respondents.

Jennifer & Block, Donald N. Bersoff and John Keiser as Amici Curiae on behalf of Plaintiffs and Respondents.

No appearance for Defendants and Respondents.

## OPINION

**BROUSSARD, J.**—The issue before us is whether a hospital may permit clinical psychologists to take primary responsibility for the diagnosis and treatment of their hospitalized patients. Prior to 1978, regulations of the Department of Health Services (hereafter Department) declared that a psychiatrist must take charge of the diagnosis and treatment of all patients admitted to psychiatric wards or hospitals.[1] In 1978, however, the Legislature enacted Health and Safety Code section 1316.5,[2] which after confirming that hospitals could admit psychologists to their staffs, provided that such psychologists may, subject to the rules of the hospital, "carry professional responsibilities consistent with the scope of their licensure and competence." In 1980 the Legislature added language declaring that if such a hospital offered services that both physicians and psychologists could perform, "such service may be performed by either, without discrimination."

When the Department in 1983 reissued its 1975 regulations prohibiting hospitals from permitting a psychologist to carry primary responsibility for the diagnosis and treatment of patients, plaintiffs sued for declaratory relief. The trial court granted their motion for summary judgment, declared the regulations invalid, and directed the Department to issue new regulations permitting psychologists to take primary responsibility for the diagnosis and treatment of hospitalized patients. After a complex procedural history, recounted later in this opinion, the Court of Appeal reversed the trial court.

---

[1] A Department regulation provided that with respect to patients admitted to the psychiatric wards of acute care hospitals, "A psychiatrist shall be responsible for the diagnostic formulation of the individual patient's treatment plan." (Cal. Code Regs. (formerly Cal. Admin. Code), tit. 22, § 70577, subd. (d)(1).) An identically worded regulation governed acute care psychiatric hospitals. (*Id.*, tit. 22, at § 71203, subd. (a)(1)(A).)

[2] All statutory references are to the Health and Safety Code unless otherwise noted.

We granted review, and now uphold the ruling of the trial court, which we believe conforms to the language and carries out the purpose of the 1978 and 1980 legislation.

## I. Background and History of This Litigation

Following the enactment of section 1316.5 in 1978, and its amendment in 1980, the Department considered amending its regulations to permit clinical psychologists to be responsible for the diagnosis and treatment of their patients. After public hearings, however, the Department on January 6, 1983, adopted regulations which provided that for patients admitted to psychiatric wards or hospitals, "[a] *psychiatrist* shall be responsible for the diagnostic formulation for each patient and the development and implementation of the individual patient's treatment plan." (Cal. Code Regs., tit. 22, §§ 70577, subd. (d)(1) and 71203, subd. (a)(1)(A), italics added.) These regulations are essentially the same as those in effect before the enactment and amendment of section 1316.5.

Plaintiffs, the California Association of Psychology Providers (CAPP) and several individual clinical psychologists, brought suit against the Department, the Department of Finance, and their directors. The complaint asserted seven causes of action. The first simply set out the facts recited previously in this opinion. The second cause of action sought mandamus on the theory that the regulations conflict with the statute. The third sought mandamus on the theory that the regulations were adopted in violation of the public hearing requirements of Government Code section 11346.8. The fourth, fifth and sixth causes of action sought injunctive relief. ▮▮▮ ▮ The seventh cause of action requested a declaration of plaintiffs' rights with respect to the hallenged regulations.[3]

Plaintiffs moved for summary judgment on the seventh cause of action. The trial court granted the motion, and entered a judgment declaring that under section 1316.5, "clinical psychologists on the medical staff of a health facility are authorized to independently provide psychological services within the legal scope of their licensure, without physician supervision and without discriminatory restrictions. The provision of psychological services includes ultimate responsibility for the psychological care of hospitalized

---

[3] A cause of action is a set of facts giving rise to a basis for relief. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 23 et seq. pp. 66-70.) Thus plaintiffs' complaint presents at most two causes of action—one arising from those facts that allegedly show the regulations conflict with section 1316.5, the other from those facts that allegedly show the regulations were not properly adopted. Such facts may constitute grounds for various remedies, such as mandamus, injunction, or declaratory relief, but the availability of alternative remedies does not mean there is more than one cause of action. (*Id.*, § 29 at pp. 73-74.)

patients and authority to admit and discharge patients provided that a physician shall be responsible for the necessary medical care of patients including completion of a physical examination upon admission of each patient." ■■ ■■ ■■ ■■ The court held regulations 70577, subdivision (d)(1) and 71203, subdivision (a)(1)(A) invalid, and ordered the Department to adopt the regulations originally proposed in 1982.[4]

The Department announced that it would not appeal the trial court order and, about a month after the oral statement of decision (and before the filing of the written judgment), adopted the regulations as directed by the court. The California Hospital Association, the California Medical Association, and the California Psychiatric Association, joined by individual doctors, moved to vacate the judgment. The trial court denied the motion for want of standing, and the moving parties appealed.

Plaintiffs moved to dismiss the appeal, contending that appellants were not properly parties to the action and that the Department's adoption of new regulations rendered the matter moot. The Court of Appeal granted the motion. In an order dated October 16, 1986, we granted appellants' petition for review and retransferred the case to the Court of Appeal with directions to vacate the order of dismissal.

Upon retransfer, the Court of Appeal ruled sua sponte that the trial court judgment was not appealable. On November 25, 1987, we again granted review and retransferred, directing the Court of Appeal to vacate its dismissal and to hear the appeal on its merits.

Pursuant to our order, the Court of Appeal addressed the merits of the appeal and reversed the judgment below. It held that the Legislature intended clinical psychologists to have the right to diagnose and treat their hospitalized patients without supervision from a physician "only in those instances where a physician has initially ruled out a medical basis for the patient's mental disorder and determined that it is not subject to medical treatment, and where the patient's mental disorder does not subsequently become susceptible to medical treatment after admission to the health facili-

---

[4] Appellants contend that the trial court exceeded its authority in prescribing the exact language of the regulations which the Department must adopt. (Cf. *Pillsbury* v. *South Coast Regional Com.* (1977) 71 Cal.App.3d 740, 756 [139 Cal.Rptr. 760]; *California Optometric Assn.* v. *Lackner* (1976) 60 Cal.App.3d 500, 509 [131 Cal.Rptr. 744].) CAPP claims, however, that the language of the court order was in fact drafted by the Department during the period between the trial court's ruling on the motion for summary judgment and the entry of judgment, and that the judge simply adopted the language the Department proposed. But even if the Department actually drafted the language in question, that language should not have been incorporated into the trial court order where its mandatory form limits the Department's future authority to revise the regulations.

ty." The statutory prohibition against discrimination, it said, prohibits requiring supervision by a psychiatrist, but only "after a medical diagnosis and medical treatment have been ruled out . . . ." We granted review and retained the case for decision.

## II. PRELIMINARY PROCEDURAL ISSUES

Our prior orders necessarily determined that the trial court ruling was appealable, that appellants have standing to appeal, and that the matter has not become moot. Those rulings are controlling under the doctrine of law of the case. (See *Pigeon Point Ranch, Inc.* v. *Perot* (1963) 59 Cal.2d 227, 230-232 [28 Cal.Rptr. 865, 379 P.2d 321].) Nevertheless, because our minute orders did not set out the reasoning of the court, and cannot serve as precedent to guide future decisions, we believe it appropriate to explain the basis for our decisions.

(a) *Appealability.*

■ The trial court entered summary judgment only as to plaintiffs' seventh cause of action. The Court of Appeal originally concluded that because the judgment did not address plaintiffs' other six asserted causes of action, appeal was barred by the one final judgment rule. (Code Civ. Proc., § 904.1.) Plaintiffs' seventh cause of action, however, sought a declaration of plaintiffs' rights with respect to the facts alleged in all other causes of action. The resulting judgment effectively disposed of the case. Once the trial court had determined that the existing regulations were invalid, and directed the Department to adopt new regulations, there would be no purpose in conducting further proceedings to decide whether to compel the same result by writs of injunction or mandamus. A judgment that leaves no issue to be determined except the fact of compliance with its terms is appealable. (*Agricultural Labor Relations Bd.* v. *Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 702 [238 Cal.Rptr. 780, 739 P.2d 140]; *Lyon* v. *Goss* (1942) 19 Cal.2d 659, 669-670 [123 P.2d 11]; see *Etienne* v. *DKM Enterprises* (1982) 136 Cal.App.3d 487, 489 [186 Cal.Rptr. 321].)

(b) *Standing to Appeal.*

■ "'Any aggrieved party' may appeal from an adverse judgment. . . . [O]ne who is legally 'aggrieved' by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663." (*County of Alameda* v. *Carlson* (1971) 5 Cal.3d 730, 736 [97 Cal.Rptr. 385, 488 P.2d 953].) Appellants having filed such a motion, the only question is whether they qualify as persons aggrieved by the judgment.

The issue is clear as to appellant California Hospital Association since the trial court directed the Department to issue regulations binding its member hospitals. The matter is less clear as to appellants California Medical Association, California Psychiatric Association, and the individual physicians. They are not directly regulated. The trial court's judgment, however, diminishes the sphere of responsibility of physicians, particularly psychiatrists, vis-à-vis clinical psychologists, and thus can be expected to affect the authority and income of the physicians.

A review of prior cases indicates that this interest is sufficient to confer standing to appeal. (See *County of Alameda* v. *Carlson, supra,* 5 Cal.3d 730, which held that the California Welfare Rights Organization was aggrieved by a declaratory judgment striking down regulations that broadened eligibility for welfare grants; *Simac Design, Inc.* v. *Alciati* (1979) 92 Cal.App.3d 146 [154 Cal.Rptr. 676], which held supporters of a growth control initiative were aggrieved by a decision mandating issuance of building permits contrary to the terms of the initiative; *Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158 [143 Cal.Rptr. 633], which held a homeowners group aggrieved by a judgment invalidating an initiative that removed their homes from a redevelopment plan.) We believe appellant physicians and psychiatrists have an interest adversely affected by the judgment (see *Estate of Colton* (1912) 164 Cal. 1, 5 [127 P. 643]) comparable to appellants in these cases.

(c) *Mootness.*

 Plaintiffs contended that the case became moot when the Department complied with the trial court's order and adopted new regulations. But the Department did not adopt those regulations as a result of ordinary administrative proceedings, but instead in response to the trial court's judgment. So long as that judgment is in effect, the Department is not free to reconsider the regulations in question. We cannot assume that the Department would adopt the same regulations if the judgment were overturned.

The present case is thus comparable to *County of Alameda* v. *Carlson, supra,* 5 Cal.3d 730, in which the trial court rendered a judgment invalidating regulations that expanded eligibility for welfare grants and the Department of Social Welfare then adopted an emergency regulation narrowing eligibility. We held that an organization representing welfare recipients could appeal from the trial court order, and decided the case on the merits.

III. DIAGNOSIS AND TREATMENT OF HOSPITALIZED PATIENTS

The Department's 1983 regulations, by providing that a psychiatrist must be responsible for diagnosis and treatment of all mental patients, prohibited

a hospital from permitting a clinical psychologist to take responsibility for diagnosis and treatment of his own patients. The Court of Appeal opinion went halfway, permitting the psychologist to exercise that responsibility only after a physician has ruled out a medical cause for the patient's condition or medical treatment of that condition. We explain that neither the Department's regulations nor the limitations in the Court of Appeal opinion conforms to the language of section 1316.5.

(a) *The Scope of Review.*

When a court inquires into the validity of an administrative regulation to determine whether its adoption was an abuse of discretion, the scope of review is limited. As we said in *Pitts* v. *Perluss* (1962) 58 Cal.2d 824 [27 Cal.Rptr. 19, 377 P.2d 83], "[a]s to quasi-legislative acts of administrative agencies, 'judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law.'" (P. 833; see *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 92-93 [130 Cal.Rptr. 321, 550 P.2d 593].)[5] When, however, a regulation is challenged as inconsistent with the terms or intent of the authorizing statute, the standard of review is different, because the courts are the ultimate arbiters of the construction of a statute. Thus, *Morris* v. *Williams* (1967) 67 Cal.2d 733 [63 Cal.Rptr. 689, 433 P.2d 697], in finding that the challenged regulations contravened legislative intent, rejected the agency's claim that the only issue for review was whether the regulations were arbitrary or capricious. Our opinion explained that "[w]hile the construction of a statute by officials charged with its administration . . . is entitled to great weight, nevertheless, '[w]hatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts.' [Citation.] Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (P. 748; see *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388-1389 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Hittle* v. *Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 387 [216 Cal.Rptr. 733, 703 P.2d 73].) Although in determining whether the regulations are reasonably necessary to effectuate the statutory purpose we will not intervene in the absence of an arbitrary or capricious decision, "we need not

---

[5] Government Code section 11350, subdivision (b), as amended in 1982, also permits a court to declare a regulation invalid if "the agency's determination that the regulation is reasonably necessary to effectuate the purpose of the statute, court decision, or other provision of law which is being implemented, interpreted, or made specific by the regulation is not supported by substantial evidence."

make such a determination if the regulations transgress statutory power." (67 Cal.2d at p. 749.)

(b) *The Plain Meaning of Section 1316.5.*

Section 1316.5, subdivision (a), provides in relevant part:

"The rules of a health facility may enable the appointment of clinical psychologists on such terms and conditions as the facility shall establish. In such health facilities, clinical psychologists may hold membership and serve on committees of the medical staff and carry professional responsibilities consistent with the scope of their licensure and their competence, subject to the rules of the health facility.

". . . If a health service is offered by a health facility with both licensed physicians and surgeons and clinical psychologists on the medical staff, which both licensed physicians and surgeons and clinical psychologists are authorized by law to perform, such service may be performed by either, without discrimination . . . ."[6]

The meaning of section 1316.5 is reasonably clear on its face. The first sentence permits a hospital to appoint clinical psychologists to its staff on such terms and conditions as it chooses. The next sentence provides that psychologists so admitted may, subject to the rules of the hospital, "carry professional responsibilities consistent with the scope of their licensure . . . ." The scope of that licensure is defined by the Psychologist Licensing Law, Business and Professions Code section 2903; it includes "diagnosis, prevention, treatment and amelioration of psychological problems and emotional disorders of individuals and groups." The only statutory limitation is that psychologists cannot prescribe drugs, perform surgery, or administer electroconvulsive therapy. (Bus. & Prof. Code, § 2904.)

■ Does this section, by giving the psychologist authority to diagnose and treat psychological disorders, also confer primary responsibility for the diagnosis and treatment? The answer is apparent not only from the language but from the history and purpose of Business and Professions Code section 2903. This section antedates section 1316.5, and thus was drafted primarily to regulate outpatient practice, and in that setting the responsibility of the psychologist is obvious. When a patient comes to a psychologist's office, the psychologist must decide whether to take the case. This necessarily involves the responsibility to consider the full range of possible causes of the patient's illness, select the appropriate treatment methods, and if treat-

---

[6] Subdivision (b) of section 1316.5 bars discriminatory classification of hospitals that grant staff privileges to psychologists. Subdivision (c) restricts staff privileges to psychologists who have doctoral degrees and two years of clinical experience.

ment involves a method beyond his authority or competence, refer the patient to someone else. If the psychologist retains the case, he or she necessarily has primary responsibility for the diagnosis and treatment—no other professional is even involved. Appellants concede this to be true for outpatient treatment, contending only that things are different in a hospital. But neither section 1316.5 nor Business and Professions Code section 2903 distinguishes between hospital and outpatient practice. It would radically rewrite the statutes for us to hold that they confer primary responsibility for diagnosis and treatment in an outpatient setting but that in a hospital the psychologist may diagnose and treat only if someone else assumes primary responsibility for such acts.

In short, under Business and Professions Code section 2903 psychologists are licensed to diagnose and treat psychological problems of individual patients, and under section 1316.5 they may carry responsibilities in hospitals within the scope of their license. It follows that psychologists may carry the responsibility of diagnosing and treating the psychological problems of patients in hospitals.[7]

The second paragraph of section 1316.5 is equally clear. It provides that if a hospital has both physicians and psychologists on its staff, and offers a service that both are "authorized by law to perform, such service may be performed by either, without discrimination." The only service both physicians and psychologists are authorized by law to perform is the diagnosis and treatment of psychological and emotional disorders, without use of drugs, surgery, or electroconvulsive therapy. The "without discrimination" clause signifies that in performing such services the two professions, each authorized by law, stand on an equal footing; neither is subject to constraints from which the other is free. Under the 1983 regulations, however, a psychiatrist may perform such services for his or her hospitalized patient if the psychiatrist believes them necessary, without referral, approval, or supervision from anyone else. A psychologist, however, can treat his or her patient only if a psychiatrist decides the services are necessary, decides not to perform them himself, and selects this particular psychologist from among the psychologists and psychiatrists available. Moreover, in performing those services, the psychologist remains subject to the supervision of the psychiatrist,[8] who retains the authority to change the treatment plan and

---

[7] The statutes and state regulations say nothing about who may admit patients to hospitals. It has become apparent, however, from the briefing and argument in this case that the usual practice is that the professional who admits the patient has primary responsibility for diagnosis and treatment. We conclude that the psychologist's statutory authority to carry the responsibility of diagnosis and treatment implies the authority to admit patients for these purposes.

[8] We do not know where the dissent gets the idea that a physician who has primary responsibility for the treatment plan has no right to supervise other professionals called in on the case. In the example given by the dissent—referral to a radiologist—presumably the supervi-

terminate the psychologist's participation. Thus the 1983 regulations compel the discrimination the statute forbids.

We conclude that section 1316.5 means what the trial court said it meant: that a hospital may permit clinical psychologists on its staff to "provide psychological services within the legal scope of their licensure, without physician supervision and without discriminatory restrictions."

(c) *The Legislative History of Section 1316.5.*

Appellants' principal argument is that, notwithstanding the wording of section 1316.5, the legislative history of the 1978 and 1980 enactments shows that the Legislature did not intend to permit hospitals to allow psychologists to assume primary responsibility for diagnosis and treatment. Appellants point out that when Senate Bill No. 259 was originally introduced in 1978, it contained a subdivision (c) which said that if a patient was admitted by a clinical psychologist, the facility shall designate a physician to provide for medical needs, but that "the patient's care, other than medical care, shall be the responsibility and subject to the direction of the psychologist." The Department advised the Legislature that this language might conflict with Medicare and Medicaid (Medi-Cal) regulations, which then provided that a patient could be "admitted to a hospital only on the recommendation of a physician." (42 C.F.R., former § 405.102(h)(l).)[9] The California Medical Association (CMA) also objected to the provisions authorizing psychologists to admit patients and giving them responsibility for treatment. The subdivision was subsequently deleted, and the Department then reported to the Governor that the amended version averted opposition from the CMA.

Likewise, Senate Bill No. 1443 in 1980 originally proposed to amend section 1316.5 to provide explicitly that clinical psychologists be allowed "to admit and treat patients within the scope of their licensure, without a physician and surgeon ordering the care." The Department again advised the Legislature that this language might jeopardize federal funding, and the CMA again noted its opposition to the language on admission and treatment. The Legislature then deleted the quoted language, replacing it with a general prohibition against discrimination.

---

sion would be minimal because the referring physician would lack competence in the subject area. But when a psychiatrist refers a patient to a psychologist for psychotherapy, the psychiatrist would have the competence to exercise as close supervision as he or she desired.

[9] In 1986, federal regulations were revised, and now permit a patient to be admitted "on the recommendation of a licensed practitioner permitted by the state to admit patients to a hospital." (42 C.F.R. § 482.12(c)(2).) Plaintiffs argue that even under the pre-1986 regulations the only requirement was that a physician be available for medical emergencies.

Finally, the dissent emphasizes that the 1983 Legislature defeated Senate Bill No. 181, which, in language virtually identical to the trial court's order, would have provided that "clinical psychologists . . . shall be responsible, within the scope of their licensure, for diagnostic formulations and the development and implementation of individual treatment plans . . . ." On the other hand, after the Department adopted regulations conforming to the trial court's order, the 1986 Legislature rejected Assembly Bill No. 3592 which would have overturned that order and restored the prior law. We note the parallel language of that bill and the Department's 1983 regulations:

| Assembly Bill No. 3592 | 1983 regulations |
|---|---|
| "A psychiatrist shall be responsible for the diagnostic formulation and the development and implementation of the treatment plan." | "A psychiatrist shall be responsible for the diagnostic formulation for each patient and the development and implementation of the individual patient's treatment plan." |

Appellants conclude from the Legislature's removal of specific language relating to diagnosis and treatment from the 1978 and 1980 legislation, and the defeat of the 1983 bill, that the Legislature did not intend to permit psychologists to diagnose and treat patients without psychiatric supervision. The defeat of the 1986 legislation, however, suggests the contrary conclusion. A number of other considerations also lead us to reject appellants' theory of legislative intent.

First, in attempting to ascertain the legislative intent, the most significant source is the Legislature's own declaration of findings and purpose that accompanied the 1978 legislation. It stated in relevant part: "The interests of the people of this state demand that all appropriate resources, including inpatient facilities, be available to assist in the diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders. However, a branch of healing arts predominately concerned with such afflictions, psychology, is under present law, unduly restricted in its access to, and utilization of, health facilities. As a result, many patients under the care of a psychologist, when admitted to a hospital, cannot continue to receive care from the therapist of their choice . . . . [¶] The Legislature further finds and declares that psychology is an independent health profession, as set forth and prescribed in the Psychology Licensing Law. The role of the psychologist as primary provider of mental health care has been repeatedly recognized at both the state and federal levels of government. In the institutional setting, psychologists play a vital role in the

clinical operation and program direction of the state hospitals, and county Short-Doyle programs. [¶] It is therefore the intent of the Legislature, in enacting this act, to authorize health facilities on local determination to make inpatient care available for psychological patients and to expand staff and professional services that may be offered by health facilities to include licensed psychologists having appropriate training and clinical experience."

According to this declaration the Legislature wanted to change "present law," because that law restricted the utilization of psychologists in "inpatient facilities," i.e., in hospitals. Since no statute then or now restricted the use of psychologists in hospitals, the Legislature's reference to "present law" must have referred to the Department's regulations requiring that a psychiatrist supervise diagnosis and treatment of all persons hospitalized for mental illness. We conclude that the Legislature intended to bring about a change in those regulations.

Moreover, the Legislature identified a particular problem that required correction—that many hospitalized patients could not continue to receive care from their psychologist. The Department's regulations required the hospital to give primary responsibility to a physician with whom the patient may have had no previous relationship—a physician who would have the authority to decide that the patient should not receive treatment from the psychologist. Thus, we again may infer an intent to alter the existing regulations.

The legislative declaration that "psychology is an independent health care profession," and its recognition of the psychologist "as primary provider of mental health care" seem designed to put the two professions—psychology and medicine—on as equal a level as possible within the scope of their respective licensures. The 1980 amendment, providing that where both professions have authority either may perform "without discrimination," confirms this conclusion. The Department's regulations, however, establish a hospital hierarchy under which physicians outrank psychologists as to those functions for which both are licensed and qualified.

Second, after the 1978 bill was enacted, Senator Carpenter requested an interpretation of its language. The Legislative Counsel responded in a written opinion that under section 1316.5, a hospital "will be authorized to permit admission of patients upon the referral of a clinical psychologist . . . [who may] treat a patient within the scope of his or her licensure without a physician and surgeon ordering the care." (Ops. Cal. Legis. Counsel, No. 16615 (Jan. 4, 1979) Psychologists' Use of Health Facilities.) A subsequent unpublished opinion of the Attorney General agreed. (Cal. Atty. Gen.,

Letter to Sen. Paul B. Carpenter re: Opinion of Cal. Legis. Counsel, No. 16615 (Mar. 15, 1979).)

When the 1980 Legislature considered amending section 1316.5, it presumably had before it the opinions of the Legislative Counsel and of the Attorney General. If those opinions misconstrued the law, here was the opportunity to correct matters. But the Legislature left intact the language construed by the Legislative Counsel and by the Attorney General, and added language prohibiting discrimination against psychologists practicing within the scope of their licensure.

■ "Opinions of the Attorney General, while not binding, are entitled to great weight. [Citations.] In the absence of controlling authority, these opinions are persuasive 'since the Legislature is presumed to be cognizant of that construction of the statute.'" (*Napa Valley Educators' Assn.* v. *Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 251 [239 Cal.Rptr. 395].) In *Meyer* v. *Board of Trustees* (1961) 195 Cal.App.2d 420 [15 Cal.Rptr. 717], the court found the Attorney General's construction of the teacher tenure requirements was decisive of the case, noting that "[a]s a contemporaneous construction, and because he was charged with the duty of rendering an opinion with respect to its meaning, the interpretation of the subject statute by the attorney general in 1936 is entitled to great respect. [Citations.] [¶] It must be presumed that the aforesaid interpretation has come to the attention of the Legislature, and if it were contrary to the legislative intent that some corrective measure would have been adopted . . . ." (Pp. 431-432.) Again in *Ventura* v. *City of San Jose* (1984) 151 Cal.App.3d 1076, 1080 [199 Cal.Rptr. 216], the court relied heavily on an Attorney General opinion concerning the preemptive effect of state fireworks regulation, stating that "We can presume that this five-year-old opinion has come to the attention of the Legislature, and that if it were a misstatement of the legislative intent, 'some corrective measure would have been adopted.'"

While we have found no cases extending that rule to constructions by the Legislative Counsel, the logic is the same. Indeed the rule is particularly compelling as to opinions of the Legislative Counsel, since they are prepared to assist the Legislature in its consideration of pending legislation.

Third, the rule of construction on which appellants rely is inapplicable to the present case. ■ They assert that "[t]he rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512].) That principle, however, cannot

apply if the specific language is replaced by general language that includes the specific instance. If, for example, a bill were introduced to prohibit discrimination against "diabetics," then amended to prohibit discrimination "on the basis of medical condition," the deletion of the reference to diabetics would not exclude them from the protection of the act. Or if a bill were introduced dealing with "teachers' salaries in Los Angeles County," then amended to deal with "teachers' salaries" generally, we would not construe it to apply to all counties except Los Angeles.

 In the present case, the language adopted by the Legislature— "scope of licensure" (1978 law) and "authorized by law to perform" (1980 law)—*includes* the authority to diagnose and treat patients, so we cannot infer an intent to exclude authority to perform such acts. And the 1980 provision barring "discrimination" against either profession would clearly prohibit a rule that members of one profession have supervisory authority over the other, so we cannot infer an intent to permit such practices.

 Finally, it is well settled "that in attempting to ascertain the legislative intention effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning." (*Weber* v. *County of Santa Barbara* (1940) 15 Cal.2d 82, 86 [98 P.2d 492]; *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 478 [156 Cal.Rptr. 14, 595 P.2d 592].) Appellants seek to exclude any statutory interpretation that would give psychologists authority to diagnose and treat hospital patients comparable to their authority over outpatients, but offer no alternative interpretation that would give any significance or role to most of the statutory language. Yet the 1978 and 1980 enactments were intended to do more than simply authorize hospitals to admit clinical psychologists to their staffs; the first sentence of the 1978 law would have sufficed for that purpose. The additional provision authorizing psychologists to carry professional responsibilities consistent with their licensure would lack significance if they may only carry such responsibilities as a psychiatrist designates. The antidiscrimination provision of the 1980 law would be equally meaningless if it did not prohibit the most significant and burdensome discrimination—the rule that a psychologist could not take responsibility for the diagnosis and treatment of his patients.

In conclusion, it is evident to us that the purpose of the 1978 and 1980 legislation was to change existing regulations and practices that prevented hospitals from fully utilizing the services of clinical psychologists to diagnose and treat patients. In enacting this legislation, the Legislature replaced the specific language originally proposed with more general language—language that was less offensive to the medical profession, less likely to provoke

difficulties with federal regulations, and above all gave greater scope for hospital discretion than did the original proposals.[10] The language it chose, however, is sufficient to make clear its purpose and to accomplish its evident objective.

(d) *The Court of Appeal Opinion.*

 The Court of Appeal also concluded that a psychologist could assume responsibility for diagnosis and treatment of patients, but held he or she could do so in a hospital only "in those instances where a physician has initially ruled out a medical basis for the patient's mental disorder and determined that it is not subject to medical treatment, and where the patient's mental disorder does not subsequently become susceptible to medical treatment after admission to the health facility."

We perceive no statutory basis for this distinction between hospital practice and outpatient practice. Business and Professions Code section 2903 gives a psychologist authority to diagnose and treat patients. It is clear that the licensing law contemplates that he may do so without supervision or prior approval from a physician. The Psychology Licensing Law makes no reference to such supervision or approval, and on an outpatient basis psychologists regularly and routinely diagnose and treat patients independently. No one, including the hospital and physician parties before this court, suggests that psychologists lack authority to do so.

Appellants contend that hospital practice is different because hospitalized patients generally have more serious disorders. It is up to the Legislature, however, to decide whether and how to distinguish between outpatient and hospital practice, and whether any restrictions on the psychologist's hospital practice should take the form of law, administrative regulation, or hospital rule. The Legislature here has chosen to leave the matter to the discretion of each hospital. By authorizing hospitals to permit psychologists to carry responsibilities consistent with their licensure, it has given hospitals discretion to allow psychologists to assume the same responsibilities vis-à-vis their hospitalized patients as in an outpatient setting. Under section 1316.5, hospitals may also adopt nondiscriminatory rules that may restrict the psychologist's scope of practice. Section 1316.5 does not permit the courts, or the Department, to enact such restrictions themselves.

---

[10] The language chosen closely parallels that of an existing statute authorizing podiatrists to practice in hospitals within the scope of their licensure, and banning discrimination against them. (§ 1316.)

Moreover, the first condition laid down by the Court of Appeal opinion—that before a psychologist may take responsibility for a hospitalized patient it must be determined the patient's disorder has no "medical"[11] basis—appears to mistake the distinction between psychology and medicine. That distinction turns on the nature of the treatment each can provide, not the origin of the condition treated. Medical methods, especially medication, are commonly used to treat mental conditions of no known organic origin. Conversely, psychological methods, including testing, counseling, and psychotherapy, are commonly used to treat organic disorders. Psychological tests, for example, are frequently used to diagnose the existence and extent of brain damage resulting from physical injury or disease and, depending on the nature of the damage, psychological methods may be the best or only way to treat the condition.

There is no bright line distinguishing conditions of physical from those of psychological origin. The ultimate cause of a patient's condition may be uncertain or unknown, and in some cases it may be unnecessary to determine that cause to treat him. Indeed, depending on one's view of theories concerning the possible genetic or chemical origin of various disorders, it may be impossible for a physician ever to "rule out" the possibility of an organic basis of the patient's condition. Thus, the authority of the psychologist cannot hinge upon a requirement that the patient's condition derive from a nonorganic cause.

The Court of Appeal's second condition—that the disorder is not subject to medical treatment—is also flawed. A patient may receive both medical and psychological treatment. Nothing in the statutes requires that if he receives both, the physician, in the words of appellant's counsel, must be "the captain of the ship." If it is necessary to designate one person as the "captain," nothing in the law denies the hospital discretion to consider such matters as the relative importance of the treatment methods and the prior relationship of the practitioners to the patient.[12]

IV. CONCLUSION

A fundamental concern underlies the arguments of appellants, the regulations of the Department, and the opinion of the Court of Appeal. They fear

---

[11] We assume by the term "medical" the parties and the Court of Appeal mean conditions of organic origin, and methods of treatment restricted to physicians. The term, of course, can also have a broader meaning; a psychiatrist giving psychotherapy is still engaged in the practice of medicine.

[12] We take no position on whether a hospital would have discretion to adopt rules comparable to those in the Court of Appeal opinion without offending the no-discrimination clause in section 1316.5. The question before us is whether the Department may by regulation preclude hospitals from exercising any discretion.

that to give responsibility for diagnosis and treatment to a professional who has received less training in the detection of organic illness and in the use of drugs will endanger hospitalized patients. Plaintiffs, of course, dispute the implication that their training and experience leaves them less qualified than psychiatrists to treat hospitalized mental patients.[13]

Such disputes over the competence of the professions must be decided by the Legislature, not the courts. By defining the licensure of psychologists, the Legislature has necessarily determined that psychologists are generally competent to practice within the scope of that licensure. The Legislature has not itself placed restrictions on that practice in a hospital setting, apart from the requirement in section 1316.5, subdivision (c), that the psychologist must have a doctoral degree and at least two years of clinical experience. Instead, it has chosen to prohibit practices that discriminate against psychologists, while permitting the hospitals to establish nondiscriminatory rules regulating hospital practice of psychologists. We recognize appellants' concern about the wisdom of the legislative decision, but we cannot sustain regulations that would effectively nullify that decision and continue unchanged practices that the Legislature sought to modify.

We conclude that under California law a hospital that admits clinical psychologists to its staff may permit such psychologists to take primary responsibility for the admission, diagnosis, treatment, and discharge of their patients.[14] The 1983 Department regulations requiring a psychiatrist to su-

---

[13] Appellants point to a variety of conditions, ranging from endocrine disorders to poisoning, which can cause symptoms of mental illness. They assert that the training of a physician is necessary to detect such conditions, and conclude that a physician must be in charge of diagnosis in all cases. Plaintiffs respond with the claim that clinical psychologists are also trained to recognize such conditions, and that most psychiatrists have so specialized a practice that they lose touch with organic medicine.

Appellants also maintain that drug treatment is necessary for most hospitalized mentally ill patients; they hint that all serious mental illness will eventually be found to be chemical disorders best treated by drugs. Plaintiffs in turn charge that psychiatrists rely too heavily on drugs, and furnish us descriptions of the serious side effects of psychotropic drugs. Fortunately we do not have to adjudicate this acrimonious and long-lasting scientific controversy.

[14] Under the trial court's order, a physician must be available to examine the patient upon admission and provide medical treatment as needed. This requirement will bring California into conformity with current federal Medicare regulations, which permit a licensed psychologist or other nonmedical professional to admit patients to hospitals, but require that a physician be on call to take responsibility with respect to any medical problem that may arise which is not within the scope of practice of the admitting professional. (42 C.F.R. § 482.12(c).) Neither the federal regulation nor the trial court's order contemplates that this physician will assume primary responsibility for treatment programs within the licensed professional's scope of practice. The responsibility that may be granted by hospitals to psycholo-

pervise diagnosis and treatment of all admitted mental patients are therefore invalid. The judgment of the Court of Appeal is reversed, and the case is remanded for further proceedings consistent with this opinion.

Mosk, J., Eagleson, J., and Stone (S. J.), J.,* concurred.

**KENNARD, J.**—I dissent.

In granting plaintiff psychologists primary responsibility for the admission, diagnosis, treatment and discharge of hospitalized patients, the majority grants by litigation what could not be achieved by legislation. In doing so, the majority fails to adhere to established standards of judicial review; disregards an eminently reasonable interpretation of the governing statute by the agency charged with its enforcement; and, through a strained interpretation of legislative history, converts legislative rejection into implied legislative acceptance.

Fidelity to established standards of judicial review, a fair reading of statutory language, and an analysis of legislative history, compel the conclusion that the Department of Health Services (Department) did not act in excess of its authority when it promulgated the challenged regulations.

DISCUSSION

A. *The Challenged Regulations*

This case involves the validity of regulations promulgated by the Department pursuant to a delegation of legislative power to license and regulate hospitals. (Health & Saf. Code, §§ 208, subd. (a), 1253, 1254, 1254.1, 1298.)[1] In implementing section 1316.5, the statute at issue here, the Department issued two regulations according psychiatrists primary responsibility for diagnostic formulation and treatment of patients hospitalized for mental problems. (Cal. Code Regs., tit. 22, §§ 70577, subd. (d)(l), 71203, subd. (a)(l)(A).) One regulation applied to general acute care hospitals, the other to acute psychiatric hospitals. (*Id.*, tit. 22, §§ 70005, 71005.)

The standard governing our review of the Department's regulations in this case is unambiguous. The regulations are not alleged to be arbitrary,

---

gists under section 1316.5 must, of course, be exercised consistent with all other statutes when they apply in a given circumstance, for example, the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.).

 * Presiding Justice, Court of Appeal, Second Appellate District, Division Six, assigned by the Chairperson of the Judicial Council.

 [1] All further statutory references are to the Health and Safety Code, unless indicated otherwise.

capricious or wholly lacking in evidentiary support; the only question before this court is whether the regulations "transgress statutory power." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 749 [63 Cal.Rptr. 689, 433 P.2d 697].) "Courts have long recognized that the Legislature may elect to defer to and rely upon the expertise of administrative agencies [citations]." (*Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 656 [128 Cal.Rptr. 881, 547 P.2d 993].) Judicial interference is warranted only when the agency has "clearly overstepped" its statutory authority. (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 356 [185 Cal.Rptr. 453, 650 P.2d 328].) "Under established principles [an agency's] construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed unless it is clearly erroneous." (*San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523].) As we observed in *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859 [176 Cal.Rptr. 753, 633 P.2d 949]: "[B]oth this court and the United States Supreme Court have recognized on numerous occasions that '[t]he construction of a statute by the officials charged with its administration must be given great weight . . . .' " (First brackets added.)

The majority invokes this legal standard but ignores its application. The majority accords no deference whatsoever to the Department's interpretation of the statutes it is charged with implementing and enforcing. Disregarding the Department's reasonable interpretation of the law, the majority substitutes its judgment for that of the rulemaking agency, in violation of Government Code section 11340.1.

As demonstrated below, the challenged regulations are (1) consistent with section 1316.5, which contains no language granting clinical psychologists primary responsibility for hospitalized patients, and (2) in conformance with the statute's legislative history, which establishes the Legislature's overwhelming rejection—by a vote of 45 to 13—of the very language that the majority claims the Department should have adopted in its regulations.

B. *Statutory Analysis*

The statutory language itself does not support the majority's holding. Subdivision (a) of section 1316.5 provides in pertinent part: "The rules of a health facility may enable the appointment of clinical psychologists on such terms and conditions as the facility shall establish. In such health facilities, clinical psychologists may hold membership and serve on committees of the medical staff and carry professional responsibilities consistent with the scope of their licensure and their competence, subject to the rules of the

health facility . . . . [¶] If a health service is offered by a health facility with both licensed physicians and surgeons and clinical psychologists on the medical staff, which both licensed physicians and surgeons and clinical psychologists are authorized by law to perform, such service may be performed by either, without discrimination."

The statute contains no express language granting clinical psychologists primary responsibility for hospitalized patients. The majority, however, insists that such a grant is implied in the statute's references to (1) the performance of services by clinical psychologists within "the scope of their licensure" and "without discrimination," and (2) their eligibility for membership on a hospital's medical staff. I disagree.

### 1. *Scope of Licensure*

The Psychology Licensing Law is set forth in Business and Professions Code section 2900 et seq. Business and Professions Code section 2903 defines the practice of psychology as follows: "The practice of psychology is defined as rendering or offering to render . . . any psychological service involving the application of *psychological principles* . . . . [¶] The application of such principles and methods includes, but is not restricted to: diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders of individuals and groups."

As the majority points out, Business and Professions Code section 2903 was drafted to regulate outpatient practice where "no other professional is even involved." (Maj. opn., *ante*, at p. 13.) Because its focus is outpatient care, the provision does not apply to hospitalized medical care. Nor does it apply to primary responsibility for the obvious reason that primary responsibility cannot be an issue when there is only one professional involved. Thus, Business and Professions Code section 2903's history and purpose cannot support the majority's position of an implied grant to psychologists of primary responsibility over hospitalized patients. Moreover, as explained below, the express terms of the statute preclude such an implied grant.

The key word in the language of Business and Professions Code section 2903 is "psychological." The majority correctly notes that psychologists have authority to diagnose and treat psychological problems of patients in hospitals. (Maj. opn., *ante*, at p. 13.) The majority, however, equates such authority with *primary* responsibility for the admission, diagnosis, and treatment of hospitalized patients.

How can primary responsibility for a hospitalized patient's care be exercised by one who lacks authority to consider the full range of possible

causes of an illness and to select the most appropriate combination of methods of treatment?

Patients do not necessarily enter hospitals with psychological conditions neatly divorced from biological, neurological, physiological or genetic disorders. The nature of an illness cannot be ascertained prior to diagnosis by a legally authorized professional. Physicians are legally qualified to provide comprehensive diagnosis and treatment; psychologists are not.

Unlike psychologists, physicians possess the legal authority to consider all possible causes of an illness. The State Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), which governs physicians, defines diagnosis as including "any undertaking by any method, device, or procedure whatsoever . . . to ascertain or establish whether a person is suffering from any physical or mental disorder." (Bus. & Prof. Code, § 2038.) In contrast, the diagnostic authority granted psychologists is severely limited. The scope of their licensure limits psychologists to the diagnosis of *psychological* problems. (Bus. & Prof. Code, § 2903.) Unlike physicians, psychologists are not allowed to "use any method, device, or procedure" or determine whether a person is suffering from "any physical or mental disorder." (Compare Bus. & Prof. Code, § 2903 with Bus. & Prof. Code, § 2038.) Psychologists are limited to the application of psychological principles to psychological disorders. (Bus. & Prof. Code, § 2903.) Thus, they may not diagnose an illness caused or complicated by nonpsychological factors.

Unlike psychologists, physicians are authorized to use "any and all . . . methods," including drugs and devices, in the treatment of physical and mental conditions. (Bus. & Prof. Code, § 2051.) Psychologists, on the other hand, are statutorily prohibited from prescribing drugs, performing surgery, or administering electroconvulsive therapy. (Bus. & Prof. Code, § 2904.) Nor may they use biofeedback instruments that pierce or cut the skin (Bus. & Prof. Code, § 2903.1); the law restricts them to the use of psychological principles (Bus. & Prof. Code, § 2903). Thus, psychologists may not provide treatment that would require more than the application of psychological principles.

There is no support for the majority's assertion that the authority to diagnose and treat subsumes the authority to admit patients into hospitals. (Maj. opn., *ante*, at p. 13, fn. 7.) The assertion cannot be statutorily based; the statutes say nothing about who can admit patients to hospitals. The Department, not this court, has the expertise necessary to resolve this issue.

As demonstrated above, the authority of a physician to diagnose and treat is different and much broader than that granted psychologists. Because

the concept of primary responsibility includes the ability to evaluate a hospitalized patient's *overall* condition and to select the most appropriate methods of treatment, the Legislature's grant of limited authority to psychologists cannot be equated with *primary* responsibility. Nothing in the statutory scheme suggests otherwise.

The majority, albeit obliquely, concedes the difference. In a footnote at the very end of its opinion, the majority, without discussion, prior explanation, or citation of relevant authority, says: "Under the trial court's order, a physician must be available to examine the patient upon admission and provide medical treatment as needed." (Maj. opn., *ante*, at p. 21, fn. 14.) This concession by the majority is inconsistent with the position it has maintained throughout its opinion that psychologists can take primary responsibility for the admission, diagnosis, and treatment of hospitalized patients.

### 2. *Prohibition Against Discrimination*

Section 1316.5 prohibits discrimination between physicians and clinical psychologists with respect to the health services *both* are authorized to perform. As shown above, the health services psychologists are authorized to provide and the health services physicians are authorized to provide are not coextensive. (See *California State Psychological Assn. v. County of San Diego* (1983) 148 Cal.App.3d 849, 853 [198 Cal.Rptr. 1].)

The antidiscrimination clause does not address the issue of who has primary responsibility for a patient. It simply requires that when psychologists and physicians are *both authorized* to provide the health service, one may not be preferred over the other. Thus, if *psychological* services are required as part of the treatment of a patient, a physician may not be selected to perform the services over a psychologist. The clause neither says nor implies that psychologists are to be given overall primary responsibility for the admission, diagnosis, treatment and discharge of hospitalized patients.

The majority asserts that the regulations violated the antidiscrimination language because a psychologist performing psychological services would be subject to the supervision of a psychiatrist. (Maj. opn., *ante*, at pp. 13-14.) The majority's unarticulated assumption is that primary responsibility for a patient necessarily entails physician control over a psychologist's performance of psychological services. It does not. Primary responsibility may encompass a physician's decision to refer a patient for psychological evaluation; it does not follow, however, that the reference therefore includes control over the psychologist's performance. A physician may also decide,

for example, to refer a patient to a radiologist. The physician does not thereby assume control over the radiologist's performance of the radiology services. The regulations challenged in this case did not provide otherwise. (*Ante,* at p. 22; maj. opn., *ante,* at p. 6, fn. 1.)

Although the medical needs of a patient may require the psychiatrist to change the treatment plan, this court should not assume, as the majority does, that "when a psychiatrist refers a patient to a psychologist for psychotherapy," the psychiatrist would exercise his or her authority to control the psychologist's performance. (Maj. opn., *ante,* at pp. 13-14, fn. 8.) Inherent in the concept of referral is a recognition of the particular competence and expertise of the health provider to whom the patient is referred. Heavy-handed supervision would be inconsistent with this recognition, whether the referral be to a radiologist or a psychologist.

### 3. *Membership on Medical Staff*

Section 1316.5 provides for health facilities to allow clinical psychologists to be members of the medical staff. Such membership encompasses responsibility to the hospital governing body for the quality of in-hospital medical care; evaluation of the qualifications of applicants and holders of staff privileges; recommendations for appointment, reappointment, curtailment and exclusion from staff privileges; and provisions for peer group methods for reviewing basic medical, surgical and obstetrical functions. (*West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 852-853 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257]; *Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623, 628 [115 Cal.Rptr. 317].)

This provision does nothing more than afford a clinical psychologist on a hospital's medical staff a voice in the policymaking body of the hospital; it does not grant the psychologist primary responsibility for patients.

The analysis above mirrors the interpretation of the statute by the Department.

### C. *Legislative History*

The legislative history of section 1316.5 reveals that the Legislature specifically considered and *rejected* giving clinical psychologists the very expansion of authority that the majority grants them.

### 1. *Senate Bill No. 259*

In 1978, Senator Carpenter introduced Senate Bill No. 259, which formed the basis for section 1316.5. Originally, the bill contained this provi-

sion under subdivision (c): "When a patient is admitted to a health facility upon referral of a licensed clinical psychologist . . . the health facility shall require that a licensed physician and surgeon be designated to provide for any anticipated or potential medical needs of the patient. However, nothing in this subdivision shall require or authorize such physician to supervise or prescribe psychological care to be provided by the licensed clinical psychologist within the scope of his licensure, and the patient's care, other than medical care, shall be the responsibility and subject to the direction of the psychologist." (Sen. Bill No. 259 (1977-1978 Reg. Sess.) § 2.)

This entire provision, however, was *deleted* before the Legislature's passage of the bill. (Sen. Amend. to Sen. Bill No. 259 (1977-1978 Reg. Sess.) Jan. 19, 1978.) As enacted in 1978, section 1316.5 contained no language whatsoever granting clinical psychologists independent admission and treatment rights. It merely provided in relevant part: "(a) The rules of a health facility may enable the appointment of clinical psychologists on such terms and conditions as the facility shall establish. Psychologists may hold membership and serve on committees of the professional staff and may possess clinical privileges and carry professional responsibilities consistent with the scope of their licensure and their competence, subject to the rules of the health facility." (Stats. 1978, ch. 116, § 2, p. 286.) The deletion of an express provision is evidence that it was not intended by the Legislature. (*United States* v. *Security Industrial Bank* (1982) 459 U.S. 70, 81-82 [74 L.Ed.2d 235, 245, 103 S.Ct. 407].)

It was not long before Senator Carpenter sought to amend section 1316.5 through Senate Bill No. 1443, which proposed to expand the authority of clinical psychologists.

2. *Senate Bill No. 1443*

In 1980, Senator Carpenter introduced Senate Bill No. 1443, which proposed amending section 1316.5 to give clinical psychologists certain independent admission and treatment rights over hospitalized patients. The proposed language read: "The rules of an acute psychiatric hospital . . . shall allow [clinical] psychologists *to admit and treat patients within the scope of their licensure, without a physician and surgeon ordering care.* However, a physician and surgeon shall be responsible for all those acts of diagnosis, treatment, or prescribing or ordering drugs for the patient which may only be performed by licensed physicians." (Sen. Bill No. 1443 (1979-1980 Reg. Sess.) § 1.)

Not only did this language resemble that contained in Senator Carpenter's original version of Senate Bill No. 259, which I discussed earlier, but it

also met a similar fate: it too was *deleted* prior to the Legislature's amendment of section 1316.5. As noted above, the deletion of a provision is evidence that it was not intended by the Legislature. (*United States* v. *Security Industrial Bank, supra*, 459 U.S. at pp. 81-82 [74 L.Ed.2d at p. 245].)

As relevant here, the amendment added the following language to the statute: "If a health service is offered by a health facility with both licensed physicians and surgeons and clinical psychologists on the medical staff, which both licensed physicians and surgeons and clinical psychologists are authorized by law to perform, such service may be performed by either, without discrimination." (Sen. Amend. to Sen. Bill No. 1443 (1979-1980 Reg. Sess.) May 7, 1980; Stats. 1980, ch. 730, § 1, p. 2178.)

Almost three years later, Senator Carpenter again attempted, through Senate Bill No. 181, to expand the responsibility of psychologists over hospitalized patients.

### 3. *Senate Bill No. 181*

Senate Bill No. 181, which Senator Carpenter introduced in January 1983, proposed adding a section 1316.7 to the Health and Safety Code to grant clinical psychologists primary responsibility for the diagnosis and treatment of hospitalized patients.

In April 1983, Senator Carpenter amended his bill by proposing that, instead of creating a new section, the bill's language be used to modify section 1316.5 as follows: "Clinical psychologists, who are members of the medical staff . . . shall, subject to the rules of the health facility . . . also be responsible, in accordance with the scope of their licensure, for diagnostic formulations and the development and implementation of individual treatment plans for their patients or for those referred to them, as appropriate." (Sen. Amend. to Sen. Bill No. 181 (1983-1984 Reg. Sess.) Apr. 13, 1983.) This version did pass the Senate. But the bill was overwhelmingly rejected by the Assembly on September 14, 1983, by a vote of 45 to 13.[2] (5 Assem. J. (1983-1984 Reg. Sess.) pp. 9356-9357.) Nine months later, on June 20, 1984, plaintiffs filed this lawsuit; they prevailed in the trial court but lost in the Court of Appeal.

There is a marked similarity between the language that the trial court ordered the Department to adopt and the language of Senate Bill No. 181

---

[2] The majority mistakenly asserts that the Legislature rejected Assembly Bill No. 3592. (Maj. opn., *ante*, at p. 15.) That bill, however, was never addressed by the Legislature or even by a legislative committee. (2 Assem. Final Hist. (1985-1986 Reg. Sess.) p. 2273.) The Legislature adjourned before taking action on the bill. (6 Assem. J. (1985-1986 First Ex. Sess.) p. 161; see Cal. Const., art. IV, § 10, subd. (a).)

that had earlier been soundly rejected by the Legislature, as this side-by-side comparison illustrates:

| Trial Court Order ¶8 | Senate Bill No. 181 |
|---|---|
| "The Department of Health Services is ordered to amend Title 22 Cal. Admin. Code §§ 70577(d)(1) and 71203(a)(1)(A) to provide as follows: 'Psychiatrists or clinical psychologists within the scope of their licensure and subject to the rules of the facility shall be responsible for the diagnostic formulation for their patients and the development and implementation of each patient's treatment plan.'" | "[C]linical psychologists as defined in Section 1316.5, who are members of the medical staff of a health facility, or who are privileged to practice or consult therein, shall be responsible, within the scope of their licensure, for diagnostic formulations and the development and implementation of individual treatment plans, as appropriate." |

The legislative history of section 1316.5 thus compels the same conclusion as the analysis of the statutory language itself: the Legislature has not granted clinical psychologists primary responsibility over hospitalized patients.

Nevertheless, the majority maintains the contrary. It claims that the 1978 statute's legislative declaration evidences an intent by the Legislature to expand the authority of clinical psychologists. (Maj. opn., *ante*, at pp. 15-16.) The majority has misread and mischaracterized the declaration, as I shall demonstrate.

Prior to 1978, the status of clinical psychologists on a hospital's staff was highly uncertain. Often, they were excluded from hospital privileges. Department regulations that were then in effect provided that the composition of the organized professional staff of a health facility would consist of physicians, dentists, and podiatrists.[3] As the Department's Enrolled Bill Report to the Governor explained: "Existing law is silent on whether a health facility may grant staff privileges to a licensed clinical psychologist. While a number of hospitals in California have granted prescribed privileges to clinical psychologists, supporters of SB 259 maintain that the bill is necessary to make it explicit that clinical psychologists may be given such

---

[3] In 1978, California Administrative Code (now the Cal. Code Regs.), title 22, section 70703, subdivison (b) provided as follows: "The medical staff shall be composed of physicians and, where dental or podiatric services are provided, dentists or podiatrists." There was no provision permitting clinical psychologists to be members of a medical staff.

privileges." (Cal. Dept. Health, Enrolled Bill Rep., Sen. Bill No. 259 (1978) p. 2.) Against this backdrop, the Legislature enacted section 1316.5 in 1978. In its declaration of purpose, the Legislature stated that "under present law" psychologists were unduly restricted in their access to and utilization of health facilities, thus preventing hospitalized patients from continuing to receive care from the psychologist of their choice.

Therefore, as set forth plainly in the legislative declaration to the 1978 statute and in the bill report to the Governor, the purpose of the statute simply was to ensure that clinical psychologists could become staff members of a hospital.

Equally misplaced is the majority's reliance on an opinion of the Legislative Counsel dated January 4, 1979, and an unpublished letter by the Attorney General of March 15, 1979. Both were in response to a request from Senator Carpenter for an interpretation of the 1978 statute, and both concluded that under the statute clinical psychologists were authorized to take primary responsibility for hospitalized patients. The majority argues that, because these opinions were rendered before the Legislature considered amending the statute in 1980, the Legislature had "the opportunity to correct matters" if the opinions were incorrect in their interpretation of the 1978 statute. The Legislature's failure to state to the contrary in its amendment of the statute, the majority reasons, indicates its acceptance of the statute's construction by the Legislative Counsel and the Attorney General before the statute's amendment. (Maj. opn., *ante*, at pp. 16-17.)

As a general principle of statutory construction, the rule of legislative acquiescence or inaction relied on by the majority is "a slim reed upon which to lean" when applied to precedential judicial decisions. (*Quinn* v. *State of California* (1975) 15 Cal.3d 162, 175 [124 Cal.Rptr. 1, 539 P.2d 761]; see also *United States* v. *Price* (1960) 361 U.S. 304, 310-311 [4 L.Ed.2d 334, 339, 80 S.Ct. 326].) In this case, the majority's reliance on the rule is wholly unjustified. When a *court* has interpreted a statute and that construction is not altered by subsequent legislation, there is, in appropriate circumstances, a reasoned basis to presume that the Legislature may be aware of the judicial construction and approves of it. (See, e.g., *Quinn* v. *State of California, supra*, at p. 175; *People* v. *Hallner* (1954) 43 Cal.2d 715, 720 [277 P.2d 393].)

Although the Legislature is presumed to know of existing judicial decisions, its awareness of a statutory analysis by the Attorney General or the Legislative Counsel is more doubtful, and the relevant circumstances should be carefully evaluated. In this case, the majority relies on documents that were *never published* and were issued some *four years* before the Legisla-

ture's vote that is supposed to demonstrate acquiescence. The majority offers no evidence that the Legislature was actually aware of either document when it voted in 1983 to reject Senate Bill No. 181,[4] nor does it provide any authority for the proposition that legislative awareness of such unpublished interpretations should be presumed.

Moreover, even if the documents had been brought to the Legislature's attention, the Legislature was free to disregard them. A published decision of an appellate court construing a statute must be considered by the Legislature because it is binding on all of the trial courts in the state. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Unless abrogated by the Legislature or contradicted by another appellate court opinion, statutory construction by an appellate court is authoritative and " 'becomes as much a part of the statute as if it had been written into it originally.' " (*People* v. *Hallner, supra,* 43 Cal.2d 715, 720.) By contrast, an analysis of a statute by the Attorney General, or by the Legislative Counsel, binds no one. (See, e.g., *Napa Valley Educator's Assn.* v. *Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 251 [239 Cal.Rptr. 395]; *People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 870 [136 Cal.Rptr. 429].) If the theory of legislative acquiesence in a judicial construction is a "slim reed" (*Quinn* v. *State of California, supra,* 15 Cal.3d 162, 175), how are we to characterize the majority's reliance on interpretations by the Attorney General and the Legislative Counsel that the Legislature may not have known of and was in any event free to disregard?

Finally, the pertinent statutes were given another and different interpretation, which *was* published, that the majority ignores in its discussion of legislative acquiescence. The Department's construction of those statutes, which is entitled to great weight (*Highland Ranch* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 859; *Meyer* v. *Board of Trustees* (1961) 195 Cal.App.2d 420, 431 [15 Cal.Rptr. 717]), was embodied in the regulations it adopted on January 6, 1983. Senate Bill No. 181 was introduced the same month, amended in April 1983, and overwhelmingly rejected on September 14, 1983. If we are to assume anything about the Legislature's awareness of existing interpretations, we should assume that the Legislature was aware of, and acquiesced in, the interpretation of the Department.

In sum, to construe section 1316.5 as according clinical psychologists independent admission and treatment authority over hospitalized patients, as the majority does, is to read into the statute the very language that the Legislature has expressly rejected. "The rejection by the Legislature of a

---

[4] The one member of the Legislature we can be sure *was* aware of these interpretations was Senator Carpenter, who had requested them. His sponsorship of Senate Bill No. 181 demonstrates how little he relied upon them.

specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512]; see also *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 845-846 [157 Cal.Rptr. 676, 598 P.2d 836]; *Stroh* v. *Midway Restaurant Systems, Inc.* (1986) 180 Cal.App.3d 1040, 1055 [226 Cal.Rptr. 153].) This court should not grant through litigation what could not be achieved through legislation

## CONCLUSION

Section 1316.5 does not expressly give clinical psychologists authority to assume primary responsibility for hospitalized patients. The statute is, at best, ambiguous and its legislative history strongly suggests that the Legislature had no intention to confer such authority. The regulations the Department enacted were within the scope of its statutory authority and consistent with the language and legislative history of section 1316.5. In disregarding the reasonable interpretation of the administrative agency charged with responsibility for enforcing the statute, and possessed of the expertise necessary to assess the practical impact of alternative interpretations, the majority has succumbed to the temptation to substitute its judgment for that of the Legislature and the Department.

Lucas, C. J., and Panelli, J., concurred.

Appellants' petition for a rehearing was denied September 20, 1990, and the opinion was modified to read as printed above. Arabian, J., did not participate therein.